The State Public Utilities Commission *ex rel.* Harley B. Mitchell *et al.* Appellees, *vs.* The Chicago and West Towns Railway Company *et al.* Appellants.

*Opinion filed October 24, 1916.*

1. Public utilities—*the purpose of the Public Utilities act.* The Public Utilities act is intended as an effective means of preventing unjust discriminations, undue preferences and extortionate rates and charges by public utilities, and in order to make the act effective the Public Utilities Commission was created, whose first power and duty under the act is to establish just, reasonable and uniform rates, charges, rules and practices by public utilities.

2. Same—*when Public Utilities Commission cannot order railway company to return to previous rate without evidence that new rates are unreasonable.* Where a railway company has changed its passenger rate before the Public Utilities act took effect, the Public Utilities Commission has no power, upon a petition by the patrons of the railway company charging that the new rate is excessive, to order the railway company to return to the old rate before, or pending, the determination, upon sufficient evidence, that the new rate is unreasonable.

3. Same—*what provision of section 36 of Public Utilities act is not applicable to first schedule of rates filed.* The provision of section 36 of the Public Utilities act that no change in rates shall go into effect pending a hearing by the Public Utilities Commission as to the reasonableness of the change, does not apply to changes made when the first schedule is filed.

4. Same—*the Public Utilities Commission cannot change rates in original schedules without hearing evidence.* No authority is given the Public Utilities Commission by the Public Utilities act to change the rates named in the original schedules filed except on evidence heard.

5. Same—*rates in force when schedules were made were the ones to be included in schedules filed.* It was contemplated by the Public Utilities act, under the provision that no service could be rendered by a public utility until its schedule of rates was filed, that the schedules should be on file when the act went into effect, and the rates in force when the schedules were made cannot be increased thereafter without the consent of the Public Utilities Commission.

6. Same—*Public Utilities Commission has power, after a hearing, to establish reasonable rates and order reparation for over-*

*charges.* The Public Utilities act affords a remedy against the continuation of excessive or unjustly discriminatory rates by the establishing of just and reasonable ones through the Public Utilities Commission, and section 72 of said act empowers the commission, after a hearing, to compel reparation for an overcharge.

7. Same—*effect of putting new rates in force before the Public Utilities act took effect.* Where a railway company has increased its passenger rates after July 1, 1913, but before the Public Utilities act took effect, and included them in the first schedule filed, the reasonableness of such rates is a question to be decided by the Public Utilities Commission only after a hearing and upon sufficient evidence.

8. Same—*what evidence may be demanded by Public Utilities Commission.* In determining the reasonableness of the scheduled rates of a railway company the Public Utilities Commission has a right to demand any evidence bearing on the question at issue, including all contracts and arrangements between said company and any other connecting company.

9. Same—*burden is on railway company to show rates are reasonable and just.* The burden is upon a railway company, on a hearing before the Public Utilities Commission, to show that its rates are reasonable, just and not excessive; and where the rates of two connecting lines are involved, if they are shown to be confiscatory as to one and excessive as to the other, the commission has the right to adjust and apportion joint rates so as to make them just and reasonably remunerative to both.

10. Same—*a confiscatory rate is void as a deprivation of property without due process of law.* A rate that is confiscatory or insufficient to pay costs of the traffic and other proper expenditures and to return to the carrier a reasonable profit on the investment infringes upon the constitutional rights of the carrier by depriving it of property without due process of law and is void, whether fixed by the statute or by the Public Utilities Commission.

11. Same—*the Public Utilities Commission may fix rate of less than two cents a mile.* The Public Utilities Commission has no power to fix a passenger rate for corporations organized under the Railroads act at a greater rate than that fixed by the act of 1907 establishing the maximum rate of two cents per mile, but said commission is explicitly authorized, by section 41 of the Public Utilities act, to fix a rate lower than two cents per mile if the evidence shows that a lower rate is just, and such section is not in violation of section 12 of article 11 of the constitution.

12. Same—*purpose of the definitions of "railroad" and "street railroad" in section 10 of the Public Utilities act.* The definitions

of the terms "railroad" and "street railroad," found in section 10 of the Public Utilities act, are for the purpose of showing what the legislature included by the use of those terms, and they do not purport to change or to modify in any way the meaning of the same terms as used in other statutes or in the constitution.

13. CONSTITUTIONAL LAW—*Public Utilities act does not violate section 4 of article 11 of State constitution.* The Public Utilities act does not violate section 4 of article 11 of the State constitution, which provides that the legislature may not grant the right to construct and operate a street railroad within a municipality without requiring consent of the local authorities, as such provision does not attempt to divest the State of its paramount authority and control of streets and highways nor of its power to fix rates for street railway companies.

14. SAME—*the Public Utilities act is not an amendment of any other act.* The Public Utilities act is a complete act of the legislature on the subject with which it deals and not an amendment of any other act.

15. SAME—*article 5 of Public Utilities act does not deprive one of property without due process of law.* Article 5 of the Public Utilities act, providing for a hearing before the Public Utilities Commission and entitling the parties to be present and to contest the facts on the merits, satisfies the constitutional requirement of due process of law, as such requirement is complied with if the person affected has sufficient notice and adequate opportunity to be heard; nor is the provision making the finding of the commission *prima facie* correct and requiring an objector to show by clear and satisfactory evidence that the commission's order is unjust or unreasonable in violation of the due process clause of the constitution.

16. SAME—*section 71 of the Public Utilities act, restricting the right to a supersedeas, is not invalid.* While the constitution secures to all persons, both natural and artificial, the right of an appeal or writ of error in all civil cases where the judgment or decree is final, the right to have the same made a *supersedeas* is not a constitutional right, and section 71 of the Public Utilities act, restricting the right to a *supersedeas,* is not invalid.

17. SAME—*legislature not prohibited from defining terms specifically for a particular act.* The legislature may in any act define terms specifically for that act, and such definitions are not prohibited by any constitutional provision simply because they are not the same definitions of the same terms used in other statutes or in provisions of the constitution.

18. APPEALS AND ERRORS—*when objections to constitutionality of a statute will not be considered.* The Supreme Court will not

consider objections to the constitutionality of a statute when the parties urging such objections are not aggrieved by the alleged objectionable provisions.

19. RAILROADS—*State may regulate passenger fares and freight rates by means of a commission.*  The State has power to regulate the passenger fares and freight rates which may be charged and collected by railroads and other carriers within the State, and this regulation may be carried on by means of an administrative body created by the State for that purpose.

APPEAL from the Circuit Court of Sangamon county; the Hon. FRANK W. BURTON, Judge, presiding.

McEWEN, WEISSENBACH & SHRIMSKI, (WILLARD M. McEWEN, and ISRAEL SHRIMSKI, of counsel,) for appellants.

P. J. LUCEY, Attorney General, TIMOTHY F. MULLEN, FRED B. SILSBEE, and WILLIS MELVILLE, for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

The Suburban railroad runs from Fortieth avenue and Twenty-second street in the city of Chicago to Brainerd avenue in LaGrange, a distance of approximately 10 miles, and it passes through Hawthorne, Clyde, Riverside and Brookfield, between said terminal points.  The company also owns and operates a cross-line on Fifty-second avenue, running from Twelfth street to Twenty-fifth street, in Chicago, and one on Harlem or Seventy-second avenue, running from Twenty-second street north into Forest Park, making the total mileage operated about 12½ miles.  It is a double-track line, except the track north of Twenty-second street on Harlem avenue, the total single-track mileage being 24.706 miles.  The company was organized under the general Railroad act about twenty years ago and owns a large portion of its right of way in its own right that is not located in any public street.  No freight is carried on the LaGrange line. The cars are of suburban or interurban type, carrying only

passengers and their hand baggage. There are no depots on the line. There are waiting stations or shelters at different points along the line but no agents are stationed at them. Tickets are sold on the cars and sometimes by merchants in towns along the line as an accommodation to their customers.

The Chicago and West Towns Railway Company was organized under the Street Railways act. It was formerly the County Traction Company, and took over certain lines outside of the city of Chicago in the so-called "traction settlement," and is operating west and northwest of the city of Chicago with a mileage of approximately 47 miles and has a single-track mileage of approximately 72 miles, running within the city of Berwyn, the town of Cicero and the villages of Lyons, Riverside, Forest Park, Oak Park, River Forest and Maywood.

Prior to December 30, 1913, both of said lines had estalished a flat rate of five cents and exchanged transfers, and that rate had been charged from Chicago to LaGrange and intermediate points. By agreement both lines were operated under the same management,—*i. e.*, they were managed from the same office by the same office help, but two sets of books were kept. Each line was operated by its own force and paid its own operatives and the expense of operation and the upkeep of its lines. On December 30, 1913, the said lines made an increase in their rates which became effective December 31, 1913, and in January, 1914, in accordance with section 33 of the Public Utilities act, they filed with the Public Utilities Commission their schedules showing all their rates and other charges and classifications then in force by them, and the schedules so filed contained the same increased rates and charges in effect December 31, 1913, and those rates have been charged and were being charged by said lines from said date and up to October, 1914. On the third day of March, 1914, two affidavits were filed before the Public Utilities Commission,—one by

George W. McGhee and the other by C. H. Greer,—setting up, in substance, that on the 29th day of March, 1914, they boarded the cars of the Chicago and West Towns Railway Company at Brookfield, Illinois, and tendered five cents for a continuous ride to Chicago,—the old rate in force July 1, 1913,—which fare was registered, and for failure to pay the further increased charges on demand they were put off its car after they had ridden the distance covered by the five cents paid, under the new rate.  On March 26, 1914, the parties to said affidavits and others as a committee wrote the commission a letter from Chicago, stating, in substance, that they were a committee appointed to ask immediate relief against said increase of rates by an order from the commission commanding the said utility companies to immediately dscontinue said advance rate and return to their rates of July 1, 1913.  The said commission on March 27, 1914, entered what is called in this record a general order, which recites, in substance, that the commission holds that any changes made by a public utility in its rates, charges and classifications for service since July 1, 1913, whereby the rates and charges exceed those in effect on said date, are all illegal unless the same have been consented to by the commission, and if any changes of rates are deemed necessary, application should first be made to the commission for its consent to make such changes; that in case any public utility has made such a change in rates it is ordered and directed to return to the rates and charges of July 1, 1913, and to continue the same in force until the commission has given its consent to change the same; that when a public utility desires to change its schedule of rates it shall file its application for such change, with a showing of the proposed rates and charges, and that where the rates and charges of the public utility in effect on July 1, 1913, are discriminatory, such utility must forthwith apply for consent to change its schedule of rates so as to comply with the law against discrimination in rates.  No notice of said order was given

to appellants by the commission until after the proceedings before the commission hereinafter mentioned.

On April 15, 1914, a petition was filed by the relators, Harley B. Mitchell and others, residents of LaGrange and Brookfield, before the commission, asking for a hearing in regard to the violation of said order of March 27, 1914, by the Suburban Railroad Company and the Chicago and West Towns Railway Company in charging excessive rates or rates in excess of those charged by said companies July 1, 1913, and setting forth in their petition certain charges that said lines were making in excess of those charged July 1, 1913. Their prayer in said petition was that the commission enter an order directing said companies to return to the rates and charges on said lines of July 1, 1913, pending a hearing on their petition, and to show cause why they should not be punished for the violation of said order of March 27, 1914. A petition was also filed by Emil G. Schmidt, receiver of the Suburban Railroad Company, asking the commission that the schedules of joint rates filed by the Chicago and West Towns Railway Company and the Suburban Railroad Company with the commission in January, 1914, being the same rates put in force by said companies December 31, 1913, by an order of the commission, be approved as just, reasonable and lawful. The petition set forth the rates, and averred that on and prior to July 1, 1913, the Suburban railroad was operated upon a five-cent fare but always at a loss, and had been operated at a loss up to January, 1914. Both petitions were consolidated for a hearing before the commission and the evidence was heard thereon. The commission entered what it termed a preliminary order on October 15, 1914, directing appellants to return to the fares in effect on July 1, 1913, "until such time as this commission may determine and fix the just and reasonable rates and fares, based upon the fair value of the property" of such companies. It further ordered that said companies file with the commission a correct and complete

275 — 36

inventory of their property by January 15, 1915. A petition for rehearing by said companies was overruled by the commission. On appeal by said companies to the circuit court of Sangamon county the order of the commission was sustained and affirmed, and said companies have prosecuted an appeal to this court.

In addition to the facts already recited in this opinion, the evidence for appellants established, without contradiction, that the Suburban Railroad Company had been operated for many years by a receiver appointed by the circuit court of Cook county and had been operated at a loss up to January, 1914. The company was capitalized at $1,250,000. Its bonded indebtedness is a like amount, and during the receivership receiver's certificates for maintenance and cost of operation had been issued to the amount of $379,821.19. The annual deficit on receiver's certificates was about $15,000. No dividends had been paid, no interest has been paid on the bonded indebtedness and no expenses for the receiver were included as part of such deficit. The gross income of the company for the two years prior to January 1, 1914, was $216,772.10. Its operating expenses were $181,902.43. Its interest on bonded indebtedness was $125,000 and on receiver's certificates $45,578.54; and its taxes aggregated $18,515.20, showing a total deficit of $154,224.07.

The new rates between LaGrange and points east of Riverside were: Cash fare 10 cents; 10-ride bearer ticket 90 cents; 25-ride bearer ticket $2; 60-ride individual commutation ticket, good for person named during the month stamped, $3. Between Brookfield and points east of Riverside: Cash fare 7 cents; 25-ride bearer ticket $1.50; 60-ride individual commutation ticket, good for the month stamped, $3.

The first five-cent fare limit covers all regular stops from LaGrange to and including Riverside. From the west limits of Riverside and intermediate points to all regular stops on lines east and north the fare is a five-cent rate. For a

ten-cent fare a passenger can ride from LaGrange to all points east on the Suburban railroad, or he can receive a transfer and for the same fare travel to any point on the Chicago and West Towns railway, thereby traveling as far as ten or fifteen miles for ten cents. By buying a 25-ride or a 10-ride bearer ticket he gets the same service for eight or ten cents, and by buying a 60-ride commutation ticket and riding it all out in the month stamped it only costs him five cents per trip for the same service. The evidence further showed that the increased rates for January, February and March, 1914, over the corresponding months of January, February and March, 1913, were, respectively, $1374.08, $999.98 and $1256.31. For the six months ending June 30, 1914, the gross income of the Suburban Railroad Company totaled $55,196.46; operating expenses, $39,764.45; interest on bonded debt, $31,249.98; interest on receiver's certificates, $11,394.60; taxes, $3464.16; and the net loss or deficit totaled $30,676.73. The average revenue per passenger for cash fares was .058 and a small fraction over,— *i. e.,* an increase of slightly over eight mills per fare. The only competent evidence offered by the relators against the showing by the receiver for the Suburban Railroad Company is, that the old five-cent flat rate had existed on the lines of that company since 1896,—the year the Suburban railroad was built,—and up to December 31, 1913.

The Public Utilities act was intended as an effective means of preventing unjust discriminations, undue preferences and extortionate rates and charges by public utilities. In order to make the act effective for the purposes for which it was enacted it provided for the creation and organization of the Public Utilities Commission, whose first power and duty under the act was to establish just, reasonable and uniform rates and charges and rules and practices by public utilities. Under the petitions in this case its first duty was to determine and declare what were reasonable and just rates to be charged passengers riding on the cars on ap-

pellants' lines. Incidentally, in the discharge of that duty the commission would necessarily have settled the question whether or not the new rates were just and reasonable and whether or not appellants should be permitted to collect the new rates charged. It had no jurisdiction or power to order appellants to charge and collect any other than just and reasonable rates, and to do so would be to defeat the very object for which the statute was created. The commission by its order in this case clearly sets forth that it could not determine, under the evidence offered, what is a just and reasonable rate until further evidence is introduced, and it continued the case for further evidence without finally disposing of the case. This order it had the right and power to make, but it did not have the right or power to make the order of March 15, 1914, or the one of October 15, 1914, ordering appellants to return to the schedules of rates of July 1, 1913, before or pending the determining of the issues in this case. The order appealed from is to be considered as though it had been made on the first day of the hearing and before evidence heard, as it is not based upon any finding by the commission on the evidence and as the case is still pending for the settlement of the question whether or not the published schedules of rates by appellants are just and reasonable.

Section 32 of the Public Utilities act (Hurd's Stat. 1916, p. 2028,) provides that all rates and charges made, demanded or received by any public utility, or by any two or more public utilities, for any service rendered or to be rendered, shall be just and reasonable, and that every unjust or unreasonable charge made, demanded or received for such service is thereby prohibited and declared unlawful. Section 33 of said act provides that every public utility shall file with the commission, and shall print and keep open to public inspection, schedules showing all rates and other charges and classifications which are in force at the time for any service performed by it wholly or partly within

this State; that such rates and charges and classifications shall not, without the consent of the commission, exceed those in effect on July 1, 1913, but that nothing in that section shall prevent the commission from approving or fixing rates and charges in excess of or less than those shown by said schedule. Section 35 provides that no service shall be rendered by any public utility until such schedules are filed, except in cases of emergency. Section 37 provides that no public utility shall charge or collect any greater or less or different compensation for any service rendered or to be rendered than is specified in its schedules on file, "except as provided in section 35," (should read, "except as provided in section 36,") nor shall any public utility refund or remit, directly or indirectly, any portion of the rates specified in said schedules. Section 36 provides that no change shall be made by any public utility in any rate mentioned in such schedules unless the commission so orders, and further provides that no change shall be made without good cause shown and a finding that such increase is justified. This section also provides that pending such a hearing for a change in the schedules of rates such proposed change shall not go into effect; but that provision is not applicable to the first schedules filed,—*i. e.*, there is no provision that the original schedules shall not go into effect pending a hearing thereon before the commission but the provisions are expressly to the contrary. Section 41 provides that whenever the commission, after a hearing had upon its own motion or on complaint, shall find that the rates or other charges or classifications in such schedules are unjust or unreasonable, discriminatory or preferential, or in anywise unlawful or insufficient, it shall determine the just and reasonable and sufficient rate and shall fix the same by its order. No authority is given the commission anywhere in the statute to change the rates named in the original schedules filed except on evidence heard. Section 68 provides for an appeal to the circuit court of Sangamon county from any order

or decision of the commission made after a final hearing, or after a hearing or refusal of a hearing upon any rule, regulation, order or decision which the commission is authorized to make without a hearing, and on the appeal the evidence before the commission is to be preserved and certified and no other evidence is to be considered on appeal. By section 69 appeals from all final orders of the circuit court of Sangamon county may be prosecuted to this court. The order appealed from in this case is not based upon any evidence and finding in the record by the commission, and the commission was without authority to make such an order except upon a full hearing and a finding upon the evidence that the old rate of July 1, 1913, is a just and reasonable rate.

It is argued that appellants violated the statute by including in their schedules and in charging and collecting rates in excess of those of July 1, 1913, without first getting consent of the commission. The act in question, by express provisions of section 86, was not to take effect until January 1, 1914. The commission had no right or power to act and had no legal existence before the act took effect. After the act took effect no service could be rendered by appellants until their schedules were filed. It was therefore contemplated that the schedules should be on file January 1, 1914, when the act took effect, and that the consent of the commission to charge a rate in excess of the rate of July 1, 1913, should be obtained after such excessive charge, if any, was included in the original schedules and after a hearing. The act does not require that the original schedules filed should contain the rate of July 1, 1913, but provides that the rates in force when the schedules are made are to be included in such schedules. Section 72 of the act provides that when complaint has been made to the commission concerning any rate, and the commission has found, *after a hearing,* that a public utility has charged an excessive or unjustly discriminatory amount for any service, the commission may order

that the public utility make due reparation to the complainants therefor, with legal interest from the date of payment of the illegal charge. The statute thus affords a remedy against the continuation of excessive or unjustly discriminatory rates by establishing just and reasonable ones through the commission and at the same time empowers it to compel reparation for overcharges. Were the public utilities required, in the first instance, to publish and collect the rates of July 1, 1913, until the commission determined whether or not they were just and reasonable and sufficient, they might be compelled to put in force confiscatory rates without any remedy to secure for themselves, pending the investigation by the commission, the just and reasonable rates the statute intended they should charge and receive.

Appellees are in error, also, in their contention that the act of appellants in putting in force the schedules of rates fixed by them on December 30, 1913, and in force December 31, 1913, was a violation of the Public Utilities act. That act was not in force at that time. If the rates by them then established were reasonable and just and not extortionate or discriminatory they had a right to charge and collect the same under the law then in force, and the statute in question had no application at that time to such rates. Whether or not the same rates were just and reasonable charges on and after January 1, 1914, is a question to be settled by the commission after a hearing, and until such question is decided by the commission, after a full hearing, it has no jurisdiction or power to order appellants to collect the rates of July 1, 1913, which they insist are confiscatory. Whether or not such rates are, in fact, confiscatory, or were shown to be such under the evidence taken, are questions to be decided by the commission, and we do not wish to be understood as expressing or intimating any opinion as to how those questions should be decided. We simply hold that if the rates are held to be confiscatory they are not just and reasonable rates, and that appellants ought not and

cannot be legally required to return to such rates or to charge and collect such rates for any period of time before the question is settled as to whether or not they are just and reasonable. The commission has a right, however, to demand any further evidence bearing upon the question at issue. It has a right to consider all contracts and arrangements between appellants as to the division of the rates collected and as to all other matters bearing on the questions in issue, and is also entitled to any and all evidence as to how the rates collected affect the Chicago and West Towns Railway Company. The rates collected may be reasonable and just and sufficient as to one of the appellants and unreasonable and unjust and insufficient as to the other. The burden is on appellants to show the rates are reasonable and just and not excessive, and if shown to be confiscatory as to one and excessive as to the other the commission has the right and power to so adjust and apportion the joint rates as to make them just and reasonable and sufficient to be reasonably remunerative to both appellants. A rate that is confiscatory or insufficient to pay costs of the traffic and other proper outlays for taxes, etc., and to return to the carrier a reasonable profit on the investment, infringes upon the constitutional rights of the carrier by depriving it of property without due process of law and is void, whether fixed by the statute itself or by the commission. *Chicago, Milwaukee and St. Paul Railway Co.* v. *Public Utilities Com.* 268 Ill. 49.

It is argued by appellants that it is beyond the power of the commission to interfere with a railroad organized under the Railroad act in the fixing of its passenger rates so long as it does not discriminate. The basis of this contention is that the legislature, in pursuance of section 12 of article 11 of the constitution of 1870, passed the Maximum Fare law of 1907 fixing the reasonable maximum fare at two cents a mile, and that the fixing of a reasonable maximum rate by the legislature was, in effect, the fixing of a

reasonable rate under the direction of the constitution, and that such reasonable rate cannot be fixed or changed except by a direct act of the legislature. We are not able to sustain this contention upon any authority or reason. No authority is cited in support thereof. Said act of 1907 was especially saved from repeal by section 41 of the Public Utilities act. The plain meaning of a reasonable maximum rate, as used in the act of 1907 and as used in said section of the constitution, is simply a reasonable limit beyond which the railroads cannot go in fixing their rates, and by section 41 aforesaid the commission cannot go beyond or higher than that rate in fixing a just and reasonable rate. The commission is explicitly authorized to fix a rate lower than the two cents per mile if the evidence shows that a lower rate is just and reasonable and sufficient, and such provision is not in violation of said section of the constitution.

As defined in section 10 of the Public Utilities act appellants are public utilities,—*i. e.,* they fall within the designation of corporations or receivers appointed by any court that "own, control, operate or manage, within the State, directly or indirectly for public use, any plant, equipment or property used or to be used for or in connection with the transportation of persons." The definitions of the terms "railroad" and "street railroad" found in section 10 of said act are employed for the simple purpose of showing what the legislature included by the use of those terms in that act. They do not purport to change or to modify in any way the meaning of those terms as used in other statutes or in the constitution. The legislature may in any act define terms specifically for that act, and such definitions are not prohibited by any constitutional provisions simply because they are not the same definitions of the same terms used in other statutes or provisions of the constitution. Such differences or changes in definitions, merely, in any new act have no tendency or purpose of changing or over-

turning or violating any constitutional provisions or statutes defining the same terms in different language.

The Public Utilities act does not violate section 4 of article 11 of our constitution. That provision is simply a limitation of the general powers of the legislature, and in one particular, only. It provides, in substance, that the legislature may not grant the right to construct and operate a street railroad within a municipality without requiring the consent of the local authorities having control of the streets or highways proposed to be occupied. That section of the constitution does not, by implication or otherwise, attempt to divest the State of its paramount authority and control of streets and highways. (*Chicago and Southern Traction Co.* v. *Illinois Central Railroad Co.* 246 Ill. 146.) It is equally clear that that section of the constitution does not deprive the legislature of its power to fix rates for such companies. Section 34 of article 4 of the constitution has no bearing whatever on the question of the authority or power of the State to fix rates for a strect railway. That section specifically provides that nothing therein contained shall be construed to repeal, amend or affect section 4 of article 11 of the constitution.

Section 81 of article 6 of the Public Utilities act is not involved in the case. It is not in contravention of section 13 of article 4 of the constitution. The Public Utilities act is a complete act of the legislature on the subject with which it deals and not an amendment of any other act. *People* v. *Knopf,* 183 Ill. 410; *School Directors* v. *School Directors,* 135 id. 464.

Appellants' contention that the act is invalid because the procedure provided by article 5 is not according to the course of the common law or of the constitutions, State and Federal, cannot be sustained. The hearing in this case is to be had before an organized tribunal. Appellants are entitled to be present and to contest the facts on the merits. The constitutional requirements of the due process clause

are complied with if the person affected has sufficient notice and adequate opportunity to be heard. *Louisville and Nashville Railroad Co.* v. *Schmidt,* 177 U. S. 230.

It is insisted that inasmuch as the findings and conclusions of the commission on questions of fact are *prima facie* true on appeal, and that no rule, regulation or order of the commission shall be set aside unless it clearly appears that the findings of the commission were against the manifest weight of the evidence produced before the commission, two different rules of evidence are provided which amount to taking property without due process of law. In regard to a similar objection raised to a like provision in section 16 of the Inter-State Commerce act the Supreme Court of the United States, in *Meeker* v. *Lehigh Valley Railroad Co.* 236 U. S. 412, said: "This provision only establishes a rebuttable presumption. It cuts off no defense, interposes no obstacles to a full contestation of all the issues and takes no question of fact from either court or jury. At most, therefore, it is merely a rule of evidence. It does not abridge the right of trial by jury nor take away any of its incidents, nor does it in anywise work a denial of due process of law." Statutes making the findings of the commission *prima facie* correct and requiring an objector to show, by clear and satisfactory evidence, that the commission's order is unjust or unreasonable, have been upheld not only in this but in other jurisdictions. *Chicago, Burlington and Quincy Railroad Co.* v. *Jones,* 149 Ill. 361; *Chicago, Rock Island and Pacific Railway Co.* v. *Nebraska State Com.* 85 Neb. 818; *Minneapolis, St. Paul and Sault Ste. Marie Railroad Co.* v. *Railroad Com. of Wisconsin,* 136 Wis. 146.

Section 71 of the act, which restricts the right of appellants to a *supersedeas* in certain cases, does not render it invalid. While the constitution secures to all persons, both natural and artificial, the right of an appeal or writ of error in all civil cases where the judgment or decree is final,

the right to have the same made a *supersedeas* is not a constitutional right. *Bryant* v. *People,* 71 Ill. 32.

Many other provisions of the act are attacked by appellants because they are supposed to infringe upon some constitutional right, the provisions providing penalties for violating the act, orders, rules and regulations of the commission, etc. It is not necessary or proper to discuss them here for two reasons: First, such provisions are not necessary or inseparable parts of the act without which it would not have been passed, therefore they may be eliminated entirely and the remainder of the statute be treated as valid, as the remainder of the act, when considered alone, is valid and capable of being carried out. (*Willcox* v. *Consolidated Gas Co.* 212 U. S. 19; *Reagan* v. *Farmers' Loan and Trust Co.* 154 id. 362.) Second, appellants are not aggrieved by the parts of the act that they insist are void. Courts will not listen to a party who complains of a grievance which is not his. *Inter-State Commerce Com.* v. *Chicago, Rock Island and Pacific Railway Co.* 218 U. S. 88.

The power of the State to regulate the fares and freights which may be charged and collected by railroads and other carriers cannot be successfully questioned, and this regulation may be carried on by means of a commission. Such a commission is merely an administrative body created by the State for carrying into effect the will of the State as expressed by its legislature. *Reagan* v. *Farmers' Loan and Trust Co. supra.*

For the reasons above given, the judgment of the circuit court is reversed and the cause is remanded, with directions to set aside the order of the commission and to direct it to further proceed with this case in accordance with the views herein expressed.

*Reversed and remanded, with directions.*