(No. 10973.—Reversed and remanded.)

THE STATE PUBLIC UTILITIES COMMISSION OF ILLINOIS *ex rel.* The Farmers' Illinois Grain Dealers Association *et al.* Appellee, *vs.* THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY *et al.* Appellants.

*Opinion filed April 19, 1917.*

1. PUBLIC UTILITIES—*Public Utilities Commission cannot suspend railroad rates without a hearing.* The Railroad and Warehouse Commission had no power to suspend railroad rates which were lower than the maximum fixed by said commission in 1906, and its successor, the Public Utilities Commission, has no power to suspend rates at all except after a hearing and taking evidence.

2. SAME—*when burden is on shippers to show that scheduled railroad rates are unreasonable.* Where the scheduled rates filed by railroad companies before the Public Utilities act took effect are lower than the maximum rates fixed by order of the Railroad and Warehouse Commission in 1906 they must be regarded as *prima facie* reasonable, and shippers who file petitions protesting against the rates filed have the burden of showing that they are unreasonable, even though they are higher than the rates charged before the schedule was filed; and the fact that the railroads have acquiesced in a void order of the Railroad and Warehouse Commission suspending the same rates does not change the situation so as to make the proceeding one by the railroads for an increase in rates.

3. SAME—*section 68 of the Public Utilities act is not unconstitutional.* The provisions of section 68 of the Public Utilities act that on appeal from an order of the commission the findings and conclusions of the commission on questions of fact shall be held *prima facie* true, and that the order of the commission shall not be set aside unless the finding is against the weight of the evidence or the order is beyond the jurisdiction of the commission, are not unconstitutional. (*State Public Utilities Com.* v. *Chicago and West Towns Railway Co.* 275 Ill. 555, followed.)

APPEAL from the Circuit Court of Sangamon county; the Hon. NORMAN L. JONES, Judge, presiding.

A. P. HUMBURG, JOHN G. DRENNAN, and GEORGE B. GILLESPIE, (E. S. BALLARD, M. L. BELL, O. E. BUTTERFIELD, C. B. CARDY, JAMES L. COLEMAN, HOMER W. DA-

VIS, HUGH J. GRAHAM, W. S. HORTON, K. K. KNAPP, R. B. SCOTT, P. B. WARREN, D. P. WILLIAMS, GARRARD B. WINSTON, R. H. WIDDICOMBE, C. C. WRIGHT, CHESTER M. DAWES, HOMER T. DICK, EDWARD M. HYZER, L. J. LACK-NEY, GARDINER LATHROP, ROBERT DUNLAP, BLEWETT LEE, J. L. MINNIS, S. H. STRAWN, EDWARD BARTON, CLARENCE BROWN, N. S. BROWN, H. W. BREMNER, GEORGE W. BUR-TON, E. A. SMITH, and WILLIAM W. COLLIN, JR., of counsel,) for appellants.

P. J. LUCEY, Attorney General, and GEORGE M. MOR-GAN, (A. D. STEVENS, and WILLIAM BACH, of counsel,) for appellee.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Sangamon county entered April 27, 1916, affirming an order made by the State Public Utilities Commission on October 8, 1914, disapproving a proposed increase of rates by appellants on intra-State shipments of grain and grain products in the State of Illinois.

Appellants and other railroad companies filed with both the Inter-State Commerce Commission and with the Railroad and Warehouse Commission of Illinois, on different dates during February, 1913, and prior thereto, and prior to thirty days before March 15, 1913, numerous schedules and tariffs of grain rates, advancing said rates over those before that time charged from one-half cent to one and one-half cents per one hundred pounds, being an average, approximately, of one cent per one hundred pounds. These rates were, first, inter-State from stations in Illinois and some points in Indiana near the Illinois-Indiana State line to the east and to the south, namely New York City, Buffalo, New York, Evansville, Indiana, Louisville, Kentucky, Memphis, Tennessee, New Orleans, Louisiana, and other

markets and points; second, inter-State from certain pro-
ducing points in Indiana to Chicago; and third, intra-State
from producing points in Illinois to the four primary
markets, Cairo, East St. Louis, Peoria and Chicago. The
said rates, both inter-State and intra-State, are shown in
the same tariffs and schedules, no separate tariffs having
been made and published for inter-State and intra-State
rates, and were filed with the Railroad and Warehouse
Commission more than ten months before the taking effect
on January 1, 1914, of the act entitled "An act to pro-
vide for the regulation of public utilities," approved June
30, 1913. This proceeding was commenced by petition filed
by the Farmers Illinois Grain Dealers Association, the Illi-
nois State Grange, the Peoria Board of Trade, the Cairo
Board of Trade, the Merchants Exchange of St. Louis and
the Springfield Chamber of Commerce before the Railroad
and Warehouse Commission, objecting to and protesting
against the advance made by the various tariffs filed by
Illinois carriers, the appellants here, with the Railroad and
Warehouse Commission, which were to become effective
March 15, 1913. In 1906 the Illinois Railroad and Ware-
house Commission, after an exhaustive examination into
the subject of rates and tariffs and many hearings of the
parties interested, had fixed maximum rates and charges-
for the transportation of grain within the State, commonly
known as the Illinois schedule or the Illinois distance tar-
iff. The petitions protesting against the advance in rates
filed with the Railroad and Warehouse Commission came
on for hearing on March 6, 1913, at which date the Rail-
road and Warehouse Commission entered an order suspend-
ing the proposed tariffs and rates and postponing their ef-
fective date until May 1, 1913, or until the further order
of said commission. Further orders were entered by the
Railroad and Warehouse Commission from time to time
suspending the said tariffs, and they were finally suspended
until January 8, 1914. On January 1, 1914, the statute

creating the State Public Utilities Commission went into effect according to section 86 of the act, (Laws of 1913, p. 460,) and the Public Utilities Commission succeeded the Railroad and Warehouse Commission. On January 6, 1914, the Public Utilities Commission entered the following order: "The tariffs of carriers carrying the increased rate complained of were suspended until the date January 8, 1914, and by direction of the State Public Utilities Commission of Illinois the secretary was directed to invite all the parties interested to appear before them on the date Thursday, January 6, 1914, at their offices in Springfield, and all the parties having due notice, the case being on the docket of the commission, both parties to the matter in controversy being present, after hearing orally the statement of both sides, it is hereby ordered that said suspension order be continued in effect until the date Monday, February 23, 1914, and that the hearing on the merits of this case be set for the date of Thursday, February 3, 1914, at the offices of the commission in Springfield." Thereafter a hearing was had before the commission on different dates, at which numerous witnesses were examined and exhibits offered in evidence. The final order and decision of the Public Utilities Commission was entered October 8, 1914, and it was ordered that the proposed increase of rates on intra-State shipments of grain and grain products in the State of Illinois be disapproved. Notices of appeal of the various railroad companies interested were filed and the cause was appealed to the circuit court of Sangamon county, where it was argued and taken under advisement, and on April 27, 1916, that court entered its order affirming the order of the Public Utilities Commission. The railroad companies prayed and were allowed an appeal to this court.

As before stated, at the time the proposed tariffs and schedules of rates were filed with the Railroad and Warehouse Commission of Illinois the same tariffs were filed with the Inter-State Commerce Commission and were pro-

tested by the same protestants. The Inter-State Commerce Commission entered a temporary suspension order and set the cause for hearing, and the cause was heard by it prior to the hearing before the Public Utilities Commission. The Inter-State Commerce Commission by its report and order of December 8, 1913, in *Grain Rates in Central Freight Association Territory,* 28 I. C. C. 549, approved certain advanced inter-State rates, and held that the carriers' proposed general increase in grain rates from Illinois points to markets outside the State were justified, and the advanced inter-State rates have since January 8, 1914, been in full force and effect.

It is claimed on behalf of the railroad companies, appellants in this proceeding, and was claimed before the Railroad and Warehouse Commission, that if the Inter-State Commerce Commission permitted the proposed rates to become effective such action should have a material bearing on the action of the Railroad and Warehouse Commission, which was superseded by the Public Utilities Commission. It was also contended by the carriers that as the rates carried by the tariffs do not exceed the maximum schedule of rates in force in Illinois as provided by the order of the Railroad and Warehouse Commission in 1906, said rates became effective when made and filed by them pursuant to the provisions of the Railroad and Warehouse act then in force, and that said rates being lower than said maximum schedules fixed by the order of 1906 of the Railroad and Warehouse Commission, the burden of showing that said proposed rates were unreasonably high was on the protestants. The Illinois maximum schedule of rates was offered in evidence and treated by the commission and the parties as being in force in accordance with the provisions of the Public Utilities act, which provides in section 82: "All findings, orders, decisions, rules and regulations issued or promulgated by the board of Railroad and Warehouse Commissioners under the acts established or conferring

power on said board, shall continue in force and have the same effect as though this act had not been passed; and the State Public Utilities Commission hereby created is empowered to enforce said findings, orders, decisions, rules and regulations in the same manner and under the same conditions as though said findings, orders, decisions, rules and regulations had been made, issued or promulgated by the State Public Utilities Commission." (Laws of 1913, p. 502.)

Evidence was offered by appellants tending to show that the proposed rates and tariffs under protest were reasonable. This evidence consisted of the testimony of rate and tariff experts, to the effect that the rates charged by the carriers before the proposed advance were too low and that the rates proposed were reasonable. In their testimony they compared the grain rates in Illinois and the grain rates in similar territory in other States. They also testified to the increased cost of materials entering into railroad construction and operation; the increased wages paid to railroad employees; the increased cost of operation; the general financial situation affecting the solvency and ability of the railroads to maintain themselves as carriers by charging the rates then in force on grain and other commodities; the shortage of income to railroads from carrying grain and other freight; the failure of carriers to realize sufficient income to pay operating expenses and fixed charges; the necessity for a general increase in all freight rates to meet the changed economic conditions that prevail, and, in general, that the railroads were not receiving a fair rate of return from intra-State Illinois business. The evidence of the protestants tended to show the more favorable conditions under which Illinois railroads operated as compared with railroads in other States; the relative density of population; the large amount of grain shipped out of the counties where raised and out of the State; the earnings of the railroads; and also tended to show a disparity in rates be-

tween certain points in the State and certain of the terminal points above mentioned as compared with other points; in short, that there was a discrimination in rates charged from certain stations to these terminal points within the State for the same length of haul.

The Public Utilities Commission found, among other things, that the affirmative act or approval by said commission was required before an increase of rates could become effective if made subsequent to January 1, 1914, and treated the proceeding as an attempt of the railroad companies to make an increase in rates and an application to that commission so to do, and held against the contention of the carriers that the proposed rates having been actually published and put into effect by them as far as it was possible to do so, and that such rates, being less than the maximum rates established by the order of the Railroad and Warehouse Commission in 1906, must be considered by it to be in force, and that the Railroad and Warehouse Commission had no authority, under the law, to suspend such rates. The Public Utilities Commission also held against the contention of the carriers that the schedules of reasonable maximum rates prescribed by the Railroad and Warehouse Commission on July 1, 1906, must be regarded as *prima facie* reasonable, and that as the rates proposed were materially lower than the maximum rates prescribed by the Railroad and Warehouse Commission, the burden of proof rested upon the protestants to show the unreasonableness of the proposed rates, and held that the burden of proof was on the carriers proposing an increase in rates under the provisions of section 36 of the Public Utilities act, which provides, among other things, that "no public utility shall increase any rate or other charge, or so alter any classification, contract, practice, rule or regulation as to result in any increase in any rate or other charge, under any circumstances whatsoever, except upon a showing before the commission and a finding by the commission that such increase

is justified." The commission further held that under section 82 of the act creating the commission it had power to enter upon an investigation of the reasonableness of rates and charges of common carriers for the transportation of grain, and may determine the reasonableness of such rates and charges and make such orders increasing or lowering the same as the facts in the case may justify, and declined to follow the order of the Inter-State Commerce Commission made as to the same rates, for the reason that the question before the Inter-State Commerce Commission was one of a proper division of rates chargeable to Illinois shipments, and that it was dealing with a division of rates rather than the reasonableness of such rates, and that the increase allowed by the Inter-State Commerce Commission was based on evidence that shipments from Illinois were not paying their proportion of rates which were presumed to be proper ones as compared with shipments from Indiana and Ohio. The commission further held that while the evidence introduced by the carriers showed that operating expenses had increased from 1906 to 1913 greater, proportionally, than the operating revenues, and that the net corporate income of certain of the roads had decreased over fifty per cent, and that large sums had been spent for additions and betterments which had been derived from new capital, and there had been a decrease of several million dollars in dividends paid, yet the evidence was insufficient to justify an increase in rates, principally because the value of the railroad properties was not shown so that it could be determined whether the income received therefrom under the former rates was a reasonable or fair return; also, that it was not shown whether the loss of income was due to inter-State business or losses on other portions of their lines than those in Illinois, and that the income from the carriage of other commodities than grain was not shown.

The reasons urged by the assignments of error for reversal of the judgment of the circuit court affirming the

order of the State Public Utilities Commission are: (1) That the Railroad and Warehouse Commission has no power to suspend the tariffs, and they became effective upon being filed in accordance with the provisions of the law then in force; (2) that when the Public Utilities Commission was created the tariffs carrying the increased rates and the Illinois maximum schedule of 1906 were both in force, and the rates carried by the tariffs, being less than said maximum schedule, were *prima facie* reasonable, and the Public Utilities Commission had no power to suspend such rates so long as it permitted the maximum schedule to remain in force; (3) that the judgment of the circuit court and the order of the Public Utilities Commission discriminate against inter-State commerce and operate as an unlawful interference with and a regulation of inter-State commerce; (4) that in giving arbitrary force to the finding of the Public Utilities Commission the circuit court denied the appellants due process of law; and (5) that said judgment and order were clearly against the manifest weight of the evidence, aside from all other points urged against said judgment and order.

As to the first point, as to whether the Railroad and Warehouse Commission and the Public Utilities Commission had the power to suspend the rates, it must be conceded that the Railroad and Warehouse Commission was purely a creature of the statute and the only power that it possessed was what the statute conferred. By section 32 of the act establishing the Railroad and Warehouse Commission (Laws of 1871-72, p. 618,) that commission was authorized to fix reasonable maximum rates and charges for the transportation of persons or property by rail, and by the act passed for the purpose of preventing extortion and unjust discrimination (Laws of 1873, p. 135,) the commission was authorized to investigate and ascertain whether the provisions of the act were violated and to cause suits to be commenced and prosecuted against any

railroad corporations which might violate the provisions of the act if within its judgment the facts so warranted. (*Railroad and Warehouse Com.* v. *Vandalia Railroad Co.* 258 Ill. 397; *People* v. *Chicago and Northwestern Railway Co.* 270 id. 232.) The Railroad and Warehouse act provided that every railroad company or other common carrier shall make and transmit to the commission a full and true statement under oath specifying the tariff of freights, showing each change of tariff during the same time, copies of such tariffs to be filed with the commission, with date of issue; also a copy of each published rate of fare for passengers and tariff of freights in force or issued for the government of its agents during the same time, copies of such tariffs to be filed with the commission at date of issue; also whether the rates of fare and tariff of freights in such published list are the same as those actually received by the company during the same time, and if not, what rates were received. Section 11 of the act provided that the said commission shall examine whether such railroad companies comply with the laws of this State now in force or which shall hereafter be in force concerning them.

The Railroad and Warehouse Commission, as has been seen, among other things was empowered to make investigations and order suits to be instituted under certain circumstances, and could establish a maximum schedule of rates and institute suits against railroad companies for extortion or for charging more than a reasonable rate. No specific power was given the commission by the statute to suspend rates. When it had established maximum rates for the transportation of freight the railroad companies could file their tariffs, which could not exceed those rates, but, of course, they could charge as much less as they chose. Section 32 of the Railroad and Warehouse act, as amended in 1911, was, in part, as follows: "The Railroad and Warehouse Commissioners are hereby directed to make for each of the common carriers doing business in this State, as soon

as practicable, upon giving due notice to all parties interested therein, and after a hearing in relation thereto, a schedule of reasonable maximum rates or charges, classification, rules and regulations, for the transportation of persons or property on or by each of said common carriers, between points wholly within this State; and said schedule shall in all suits brought against such common carriers, wherein is in any way involved the charges of any such common carriers for the transportation of any person or property, or unjust discrimination, shall be deemed and taken in all courts of this State as *prima facie* evidence that the rates therein affixed are reasonable maximum rates and charges for the transportation of persons and property upon the common carriers for which said schedules may have been respectively prepared. Said commissioners may, from time to time, as often as circumstances require, change and revise said schedules." (Laws of 1911, p. 480.) It is true that section 31 of the act, added by amendment in 1911, empowered and authorized the commission to hear and determine all questions arising under the act upon giving due notice to all persons, individuals or corporations interested therein and to enter an order in relation thereto, but we do not think that this section can be construed, in connection with the entire act, as putting the whole matter of the regulation of railroads into the hands of the Railroad and Warehouse Commission, so as to give it the power to suspend rates that were lower than the maximum rates it had once fixed. So construed, the provision would be conflicting with the section giving it the power to determine and fix reasonable maximum rates for the carriage of freight and passengers. In *People* v. *Chicago and Northwestern Railway Co. supra,* we held that the Public Utilities Commission, as the successor of the Railroad and Warehouse Commission, had no power to make an order finding unjust discrimination and ordering a railroad company to extend its zone to include the complainant's plant, but its

only power was to bring suit against the railroad company under the act of 1873. In that case a company engaged in shipping sand and gravel filed its complaint with the Railroad and Warehouse Commission, alleging that the Chicago and Northwestern Railway Company unjustly discriminated against it by excluding its plant from a sand and gravel zone known as the "Fox River District," in which zone or district certain rates were charged to shippers, and charged the complainant higher shipping rates than the rates charged shippers located in that zone or district. The question for decision was whether the Railroad and Warehouse Commission had jurisdiction to compel the railroad company to extend the Fox river zone or district from its limit of fifty-five miles from Chicago to include the plant of the complaining company, which was situated ninety miles from Chicago, to prevent what the commission found would be an unjust discrimination against the complaining company in reaching a common market for sand and gravel. It was held that the commission had no jurisdiction to make such an order.

One of the principal duties of the Railroad and Warehouse Commission was to fix a schedule of reasonable maximum rates and to change the same from time to time, as might be necessary under changing conditions of transportation. When such schedules were made and the charges fixed the carriers were required to file their tariffs, not exceeding the charges so fixed, and there can be no question but that it was the right of the carriers to fix their charges and be entitled to collect for freight transported accordingly. When the commission had done this its power was exhausted. Of course, under such schedule there might be some individual cases of discrimination that would be cause for complaint and investigation by the commission, but there is no question of that kind in this case. Accordingly we think that the Railroad and Warehouse Commission had no authority to enter the order it did suspending the rates

filed with the commission as long as such rates were lower than the maximum reasonable rates already fixed by the commission. As to the power of the Public Utilities Commission to suspend such rates, in the recent case of *State Public Utilities Com.* v. *Chicago and West Towns Railway Co.* 275 Ill. 555, we held that where a railway company has changed its passenger rates before the Public Utilities act took effect, the Public Utilities Commission has no power, upon a petition by the patrons of the railway company charging that the new rates are excessive, to order the railway company to return to the old rates before and pending the determination, upon sufficient evidence that the new rates are unreasonable. We further held in that case that where a railway company has increased its passenger rates after July 1, 1913, but before the Public Utilities act took effect, and included them in the first schedule filed, the reasonableness of such rates is a question to be decided by the Public Utilities Commission only after a hearing and upon sufficient evidence. In this case, while the Railroad and Warehouse Commission had no power to arbitrarily suspend the rates in question and the Public Utilities Commission had no power, by its order of January 6, 1914, to suspend such rates, or to suspend them at all except after a hearing and taking evidence, still the railroads have never, as a matter of fact, put these rates into effect or actually made their charges thereunder, having acquiesced in the different orders of the Railroad and Warehouse Commission and the order of the Public Utilities Commission and until the matter was finally heard and determined on its merits by the Public Utilities Commission. From the view point of the protestants these rates have never actually been in force, and if the rates in question had actually been those charged by the railroad companies, the protestants would have had the right to bring the matter before the Public Utilities Commission, as they did, and ask that body to investigate and determine the matter, and it would have been

proper, under the provisions of the Public Utilities act, and under the holding in *State Public Utilities Com.* v. *Chicago and West Towns Railway Co. supra,* construing portions of the act, to proceed as it did.

As to the second point, the maximum schedule of rates fixed by order of the Railroad and Warehouse Commission in 1906 is still in force (Public Utilities act, sec. 82,) and has never been changed. The proposed rates of 1913 fixed by appellants were lower than the rates fixed by said schedule, and this being true, we think that the Public Utilities Commission adopted the wrong rule by placing the burden of proof upon appellants to establish the reasonableness of such rates. If this were a proceeding before the Public Utilities Commission to change and raise the maximum rates promulgated by order of the Railroad and Warehouse Commission in 1906 a different rule would obtain, but maximum rates having been fixed and the order fixing such rates being still in force, any rates fixed by the railroads lower than the rates fixed by the commission would be lawful and reasonable charges, and the burden would be on the parties in interest protesting against such rates to establish the contrary. In other words, the question really before the Public Utilities Commission was not a question of raising rates but a question of lowering rates which the railroads might lawfully establish. The fact that appellants acquiesced in the void order of the Railroad and Warehouse Commission suspending the rates does not change the position of the parties so that the appellants can be said in the present case to be asking for an increase in rates. They did all that they could when they filed their new tariffs with the Railroad and Warehouse Commission, as required by law. The same matter was pending before the Inter-State Commerce Commission, and undoubtedly from their point of view it was necessary that the question of these rates should be decided by both the Inter-State Commerce Commission and the Railroad and Warehouse Commission, or

its successor, the Public Utilities Commission. Whatever order was entered by the Railroad and Warehouse Commission, or by its successor, the Public Utilities Commission, could be appealed from, as has been done, and the rights of the parties must be determined as of the time when such order was made. In any event, the appellants should not be penalized for obeying an order of a lawfully constituted agency of the government and in pursuing a lawful method to seek to have that order reversed by proper authority.

As to the third point, that the order of the Public Utilities Commission operates as an unlawful interference with inter-State commerce, the questions involved are altogether those pertaining to intra-State rates. The State has full power to regulate railroad rates between points solely within the State. (*Simpson* v. *Shepherd,* 230 U. S. 352,—the Minnesota rate cases; *Missouri Pacific Railway Co.* v. *Larabee Mills,* 211 id. 612.) In *Chicago, Milwaukee and St. Paul Railway Co.* v. *State Public Utilities Com.* 268 Ill. 49, we held that the Public Utilities Commission has power, on complaint being made, to fix a reasonable rate for hauling coal and manure in car-load lots to a point within this State from the junction point within this State at which such cars are received from forwarding carriers even though some cars may come from points outside the State, where neither the complaint nor the order of the commission purports to relate to inter-State shipments but only to shipments originating in this State; and the converse of the proposition would be true, that the Public Utilities Commission could regulate the rate on car-load lots from points within the State to other points within the State although from such latter point the shipments might go beyond the State.

Appellants cite and rely upon *Houston East and West Texas Railway Co.* v. *United States,* 234 U. S. 342, as authority. The effect of that decision is, as explained in *Chicago, Milwaukee and St. Paul Railway Co.* v. *State*

*Public Utilities Com. supra,* that Congress has the power
to prevent the common instrumentalities of inter-State and
intra-State commercial intercourse from being used in such
intra-State operations to the injury of inter-State com-
merce. That case arose on the complaint before the Inter-
State Commerce Commission of shippers of Shreveport,
Louisiana. The railroads between Shreveport and Texas
points were charging more for freight shipments from
Shreveport to such points in Texas than they were charg-
ing between the same points to other places in Texas of
greater distance, and the Inter-State Commerce Commis-
sion found the inter-State rates to be unreasonable and dis-
criminatory, and ordered the railroads to desist from such
discrimination and charge the same rates from Shreveport
to different points ·in Texas as between Texas points of
similar distances, or, in other words, to make the same
inter-State rates as they made intra-State rates. As fur-
ther pointed out in the opinion in *Chicago, Milwaukee and
St. Paul Railway Co.* v. *State Public Utilities Com. supra,*
there is not a railroad in the State which does not receive
cars from outside the State or send cars outside the State,
and if the Public Utilities Commission cannot regulate
charges because a shipment might be from outside the State
or destined to go outside the State, then it would be wholly
without power to regulate transportation within the State
boundaries.

Since this case was submitted the decision of this court
in *Chicago, Milwaukee and St. Paul Railway Co.* v. *State
Public Utilities Com. supra,* has been affirmed by the Su-
preme Court of the United States, (37 U. S. Sup. Ct. Rep.
No. 6, p. 173,) and it is clear from the opinion of the
court in that case and in other cases that a State com-
mission may regulate the rates of carriers within the State
where there may be a blending of inter-State and intra-State
operations of inter-State carriers unless Congress has exer-
cised its paramount constitutional power to limit the au-

thority of the State. There is no reason for further discussion on this point beyond holding, as we do, that the Public Utilities Commission has jurisdiction of the subject of rates within the State and the power to hear and determine the matters in controversy in this case. For other reasons stated in the opinion the case must be reversed, and we are not yet at the point where it is shown that rates finally determined and fixed, after a full hearing by the Public Utilities Commission, are in conflict with any act of Congress or order of the Inter-State Commerce Commission. The order of the latter body relied on dealt with a proper division of rates on Illinois shipments to the Atlantic seaboard as compared with rates on inter-State shipments from Indiana and Ohio.

As to the fourth point, it is insisted that the provisions of section 68 that on appeal from an order of the commission "the findings and conclusions of the commission on questions of fact shall be held *prima facie* to be true and as found by the commission; and a rule, regulation, order or decision of the commission shall not be set aside unless it clearly appears that the finding of the commission was against the manifest weight of the evidence presented to or before the commission for and against such rule, regulation, order or decision, or that the same was without the jurisdiction of the commission," are unconstitutional. The same point was raised and decided adversely to the contention of appellants in *State Public Utilities Com.* v. *Chicago and West Towns Railway Co. supra,* and on page 571 of the opinion in that case numerous authorities were cited in support of the proposition there announced and which need not be repeated here.

As to the last point urged, that the judgment and order are clearly against the manifest weight of the evidence, as the case must be reversed for other reasons it is not necessary to discuss that point at this time.

We think that the Public Utilities Commission adopted the wrong rule as to the burden of proof, and that, the appellants having filed a schedule of rates which was lower than the maximum rates fixed by the order of the Railroad and Warehouse Commission in 1906, such schedule of rates filed by the appellants must be considered *prima facie* reasonable and that the burden of proof would be on the contestants to show that such rates are unreasonable, and the hearing should have proceeded on such theory, and when the cause is remanded it will be the duty of the Public Utilities Commission to consider all the evidence of the parties offered on that subject. There can be no question, from the evidence, that there has been a great change in conditions and a great increase in the expenses and cost of operation of the appellant railroads since 1906. As to whether the business of appellants and their earnings have increased in proportion or whether conditions are such in this State that they are still making a fair return on the investment is not so clear. The railroads are entitled to fair treatment and to charge such rates as will enable them to make a fair return on the capital invested in those enterprises, and the shippers and patrons of the railroads are entitled to protection from extortionate charges and to have their products carried at reasonable rates. Primarily, as a practical matter of business, the farmers, the shippers and the business interests of the country want service. They want cars for their products and merchandise, and want the railroads kept in such a condition and with sufficient equipment to handle the business of the country under conditions which, as shown by the evidence before the commission, and which we know as a matter of common observation, have changed since the maximum rates were fixed by the Railroad and Warehouse Commission in 1906. It would be a short-sighted policy and result in enormous losses to the farmers and shippers of grain, as well as to dealers in all other commodities, if the railroads were not able, on account

of inadequate receipts, to provide the cars and other better-
ments necessary to take care of the business offered them.
On the other hand, the railroad companies will simply be
standing in their own light by charging rates which are un-
justifiable. The country depends in a great measure upon
the railroads and the railroads depend for their business up-
on the country. We express no opinion at this time as to
whether the increase in rates was justifiable or not. The
Public Utilities Commission held that the burden of proof
was on the carriers to show that such rates were reasonable,
and but for that holding the matter would have been more
fully gone into. The different conflicting interests repre-
sented in this suit, and the Public Utilities Commission,
have devoted a great deal of time and labor that will go far
towards a proper adjustment of the matters in controversy.
We think the proper practice in the present proceeding
would be to treat the petition filed by the protestants as a
protest against the rates filed by appellants,—for this, in
effect, is what it really is,—and for the Public Utilities Com-
mission to hear further evidence, in which the physical valu-
ation of the properties of appellants can be shown and any
further matters desired by both parties bearing on the ques-
tion, and by so doing the matter can be more promptly and
effectually settled to the satisfaction of all concerned. The
proposed rates are not to go into effect or any change made
in the rates now actually being charged until the final order
of the commission is made.

The judgment of the circuit court of Sangamon county
will be reversed and the cause will be remanded to that
court, with directions to set aside the order of the commis-
sion and direct the commission to further proceed with this
case in accordance with the views herein expressed.

*Reversed and remanded, with directions.*