THE COMMERCE COMMISSION *ex rel.* The Danville Brick° Company, Appellee, *vs.* THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY, Appellant.

*Opinion filed February 18, 1926.*

1. PUBLIC UTILITIES—*burden is on complainant to prove rate unreasonable.* The burden is on an industrial concern filing complaint with the Commerce Commission to prove that an established freight rate of which it complains is unreasonable.

2. SAME—*change in rate must be based on evidence of existing conditions and not on previous errors.* An order of the Commerce Commission not based upon the evidence should be set aside, and in making a change in a short-haul coal rate on complaint of an industrial concern the new rate established must be based upon a consideration of what at the present time constitutes a reasonable rate without regard to previous errors in fixing the rate based on percentages of increase and decrease in freight rates generally.

3. SAME—*section 3 of Public Utilities act authorizes commission to designate place of hearing.* Section 3 of the Public Utilities act, providing that hearings before the Commerce Commission shall be held in the county or counties where the subject matter is situated, "or at the place which in the judgment of the commission shall be most convenient to the parties to be heard," authorizes the commission to designate a place of hearing outside such county or counties.

4. SAME—*who is an "officer" of Commerce Commission under section 60 of Public Utilities act.* An "officer" of the Commerce Commission, within the meaning of section 60 of the Public Utilities act, does not mean the holder of an office as defined in the constitution, but the term is used in its popular sense, as one holding a position of trust and authority in any kind of organization.

5. SAME—*rate expert appointed by Commerce Commission may conduct hearing.* Under section 60 of the Public Utilities act a rate expert appointed by the Commerce Commission is authorized to conduct a hearing as an officer of the commission, as the statute authorizes the commission, when necessary in making its investigations, to appoint officers who shall have the power, under the direction of the commission, to hold investigations and hearings.

6. STATUTES—*when general provision will be given effect.* The rule that a particular provision in a statute will be given effect

over a more general provision will not be applied where the particular provision is in the alternative and includes all possible cases, and which, if given effect in derogation of a more general provision, renders the latter meaningless.

7. SAME—*intention of legislature will be given effect.* The object of construing statutes is to arrive at the intention of the legislature, and where the intention is clear, rules of interpretation inconsistent therewith must give way.

THOMPSON and HEARD, JJ., dissenting.

APPEAL from the Circuit Court of Vermilion county; the Hon. AUGUSTUS A. PARTLOW, Judge, presiding.

REARICK & MEEKS, D. P. CONNELL, and L. P. DAY, (L. J. HACKNEY, and H. N. QUIGLEY, of counsel,) for appellant.

CLARENCE B. CARDY, (ISHAM, LINCOLN & BEALE, of counsel,) for appellee.

OSCAR E. CARLSTROM, Attorney General, and ALBERT D. RODENBERG, (H. E. WOOD, of counsel,) for the Commerce Commission.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

The circuit court of Vermilion county affirmed an order of the Illinois Commerce Commission requiring the Cleveland, Cincinnati, Chicago and St. Louis Railway Company to establish a rate of twenty-nine cents a ton for the transportation of bituminous coal in Vermilion county from Mission Mine No. 1 of the United Electric Coal Companies to the plant of the Danville Brick Company, and file with the commission, within sixty days, a verified statement as to the amount of reparation due on all shipments of bituminous coal from Mission Mine No. 1 to the plant of the

brick company in accordance with the findings of the commission, and the railroad company has appealed.

The order was entered after a hearing upon a complaint. filed by the Danville Brick Company charging that the rates exacted by the railroad company from the brick company since September 1, 1920, have been excessive, unreasonable and unjust and praying for the establishment of a just, reasonable and non-discriminatory rate and for reparation for excess charges.

The Peoria division of the railroad company runs west from Danville and the Cairo division south. The plant of the brick company is on the Cairo division, about one-half mile south of its junction with the Peoria division. Mission Mine No. 1 is on the Peoria division, about four and one-half or five miles west of the junction with the Cairo division. South of the plant of the brick company is the Lyons yard of the Cairo division, and between the junction and Mission Mine No. 1 is the Hillary yard of the Peoria division. The plant of the brick company is within the Danville switching district, the western limit of which is the Hillary yard. Mission Mine No. 1 is two miles west of the Hillary yard. The rate charged for the transportation of coal from Mission Mine No. 1 to the brick company's plant has been fifty-eight cents a ton. The rate for transportation within the Danville switching district is twenty-five cents a ton. That service is rendered by a switching crew, which is engaged in the work for less than nine hours a day, receiving very little overtime pay. Mission Mine No. 1 is served by a line crew which leaves the Lyons yard. Empty cars are supplied to the mine mostly from the Hillary yard, though occasionally some are supplied from the Lyons yard and some from Oakwood, which is west of the mine. The engine crew works out of the Lyons yard and goes on duty about 4:30 in the morning daily, except Sunday. The engine goes to Danville Junction, where it picks up passenger coaches and a caboose in

which miners are transported from Danville Junction and intermediate places to Mission Mine No. 1 and other mines in the neighborhood. From the mine the train proceeds west to Oakwood and hauls the miners from there to the mines. The passenger coaches are then detached, the loaded coal cars are picked up and hauled to the Hillary yard and empty cars are then delivered to the mine. At 3:50 in the afternoon the crew starts returning the miners to their homes, and as a rule the day's work is completed about 5:30 in the evening. Thus the crew works several hours over-time each day. The pay for an eight-hour day for each of the two crews, the line crew and the switching crew, is substantially the same, the former being $29.24 and the latter $29.92. The wages for overtime are one-half higher than regular wages. After the loaded cars are delivered by the line crew to the Hillary yard a switching crew classi-fies them in the yard. A third crew makes delivery of coal and empty cars to the brick company and takes the cars that are loaded with brick to the Hillary yard for classifi-cation. A rate of twenty-five cents a ton applies to the switching or industrial limits that have been established at Danville to extend east 2.1 miles, west 4.96 miles and south 6.15 miles from the passenger station, and the rate is com-mon to all stations on lines of the Big Four for the hauling of coal between points within the industrial limits except Hillsboro, Illinois, where the rate is thirteen cents. In the Danville industrial limits the rate of twenty-five cents may be for a haul of 8.35 miles, while the haul from Mission Mine No. 1 to the brick company's plant is not more than six miles and the rate is fifty-eight cents.

The rate changes which produced the present rate of fifty-eight cents as ascertained by the commission were as follows: The rate of sixteen cents was established by the appellant prior to April 24, 1917. By an order effect-ive October 16, 1917, the Illinois Commerce Commission authorized an increase of fifteen cents a ton. This rate

of thirty-one cents was increased to fifty cents on June 25, 1918, under general order No. 28 issued by the Director General of Railroads. It was increased by similar orders from time to time, so that on February 19, 1920, the rate was sixty-four and five-tenths cents. On July 1, 1922, a general reduction of 10 per cent was ordered on all freight rates, resulting in the rate of fifty-eight cents. These changes resulted in an increase of 262 per cent in this rate, while general freight rates in Illinois have been increased only 75 per cent. The commission's orders fixing the rate of twenty-nine cents is based upon its finding "that the transportation conditions surrounding the transportation of bituminous coal from Mission Mine No. 1 of the United Electric Coal Companies at Danville, Illinois, to the plant of the Danville Brick Company at the same point, is not substantially different from the transportation conditions surrounding the transportation of coal between industries in the Danville switching district," and upon the further fact that had the same percentages of increase and decrease which were required to be made in freight rates generally been made applicable to coal also, the rate which is now the subject of consideration would have been twenty-nine cents instead of fifty-eight cents.

It is to be observed that Mission Mine No. 1 is not at Danville but is entirely outside the switching district and is not at the same point as the plant of the Danville Brick Company, and that there is no evidence in the record in regard to the transportation conditions surrounding the transportation of coal between industries in the Danville switching district and no basis for a comparison except that there is evidence of a difference in the service rendered in the transportation of coal from the mine and within the switching district, as is shown by the finding in the order that the service performed under the rate in question is rendered by a mine run crew and not by a switching crew. This crew, under the evidence, is classed as a road crew, and

the transportation of the coal from the mine to the Hillary yard must be regarded as a road-haul movement and not comparable as to proper charges for the service with switching movements.   While the road crew is paid a slightly lower wage than the switching crew for a regular eight-hour day, it works three or four hours overtime to thirty or forty-five minutes overtime by the switching crew, and therefore the cost of the road crew is higher than that of the switching crew.   This road crew or mine crew also handles passenger coaches between Danville Junction and Oakwood for the hauling of miners between their homes and the mine, but it is not this fact that distinguishes it from the switching crew but the fact that it goes outside the yard limits.   The superintendent of the railroad company testified that this crew could not be changed to a switching crew because the schedule and agreement with the train organizations would not permit, and the yard could not be extended because the organizations of the appellant's employees would oppose it.   The mine run crew did not take cars from the mine directly to the brick company's plant.   Coal from Mission Mine No. 1 to the brick company is hauled by the road engine to the yard.   The yard engine classifies the cars into cuts, the cuts are pulled out of the yard, and the cars are finally delivered to the brick company's plant by a switch engine.

The burden of proof was on the brick company to show that the rate of which it complains is unreasonable.   (*Public Utilities Com.* v. *Atchison, Topeka and Santa Fe Railway Co.* 278 Ill. 58.)   The only evidence that the charge for carriage between points within industrial limits is fair and reasonable is that the rate is general except at Hillsboro.   There is no evidence that the rate of fifty-eight cents for hauling from Mission Mine No. 1 is or is not reasonable and fair, except a comparison between it and the rate within the industrial limits and a comparison with line rates for the hauling of coal similar distances between

other points.   The rate of fifty-eight cents applies from all mines on the lines of the Cleveland, Cincinnati, Chicago and St. Louis, the Wabash and the Chicago and Eastern Illinois railroads and the Illinois Traction System in the vicinity of Danville to the industries in Danville.   The distances of the mines from Danville range from three to twelve miles.   Exhibits in evidence show that the rate for hauling coal like distances is less in some places and more in others, but it does not appear that conditions are the same.

An order of the commission not based upon a foundation in the evidence should be set aside.   Even if the transportation of coal from the mine to the brick company's plant, including the road haul, is comparable, as to the reasonableness of the charge, with a switching movement within the switching limits, the evidence does not show whether the one charge is unreasonably high or the other unreasonably low.   If there is no difference in conditions and twenty-five cents is a reasonable rate within the switching limits there is no sufficient reason for fixing the rate from the mine at twenty-nine cents,—16 per cent higher.   The same rule applies to a comparison of the rates for other line hauls for similar distances.   If it is granted, as seems to be assumed, that the same rate should prevail, there is no basis in the evidence for raising one or lowering another.

The real basis for the order seems to be in the finding that the rate would now be twenty-nine cents instead of fifty-eight cents if the same percentages of increase and decrease which were required to be made in freight rates generally had been made applicable to short-haul coal rates and applied to the rate of sixteen cents in force in 1917. This is not, however, a proper foundation for an order now fixing a rate.   Whatever errors may have been made in the past by the rate-making power may be remedied by a new order fixing the proper rate, but it must be done by

an order based upon a consideration of what now constitutes a reasonable rate without regard to previous errors.

The hearing of the complaint was held in the city of Chicago by a transportation rate expert of the commission, and it is insisted that the order is void both because the hearing was in Cook county instead of Vermilion county, where the subject matter of the hearing was situated, and because it was not held by a commissioner or assistant commissioner. The first reason is based on the following language in section 3 of the Public Utilities act: "All hearings before the commission or any commissioner or assistant commissioner shall be held within the county in which the subject matter of the hearing is situated, or if the subject matter of the hearing is situated in more than one county, then at a place or places designated by the commission, or agreed upon by the parties in interest, within one or more such counties, or at the place which in the judgment of the commission shall be most convenient to the parties to be heard." As the subject matter of the hearing was wholly in Vermilion county, the appellant argues that the first clause of the language quoted controls and is not affected by the last clause, which the appellant says refers only to cases where the subject matter of the hearing is situated in more than one county. The sentence on the construction of which the question depends contains three clauses, the first applying to cases in which the subject matter of the hearing is situated in one county, only; the second to cases in which the subject matter is situated in more than one county; and these two clauses include all cases, and the second clause also authorizes the place of hearing to be designated by the commission. What, then, was the reason for adding the third clause, which also authorizes the commission to designate the place of hearing? Obviously, it is redundant so far as the second clause is concerned, and its only purpose was to declare that the commission should

have this power in all cases, whether those mentioned in the first clause or the second.

It is a rule of interpretation of statutes that where there is in a statute a particular enactment and also a general one which in its general terms would include the particular, the latter must be given effect and the general enactment taken to affect only such cases within its language as are not within the provisions of the particular enactment. But that rule is not applicable to the sentence which is the subject of construction here, where the alternatives included in the two particular provisions exhaust all possible cases, and the third clause is entirely superfluous and meaningless unless held to apply in all cases. The object of the construction of statutes is to arrive at the intention of the legislature, and where the intention is clear, rules of interpretation inconsistent with that intention must give way.

The objection that the hearing was not held by a commissioner or assistant commissioner is based on the provision of section 60 of the Public Utilities act that "hearings shall be held either by the commission or by one or more commissioners or assistant commissioners." The first sentence of this section also provides: "The commission, or any commissioner, assistant commissioner, or officer of the commission designated by the commission, shall have power to hold investigations, inquiries and hearings concerning any matters covered by the provisions of this act, or by any other acts, relating to public utilities subject to such rules and regulations as the commission may establish." This hearing was held by Harry M. Slater, who was the transportation rate expert of the commission and an officer of the commission duly authorized on its behalf, to whom the case, when called for hearing by the commission, was assigned to receive evidence submitted by the parties. His appointment was made by the commission by virtue of section 3 of the Public Utilities act, which authorized the commission, with the approval of the Governor, "to ap-

point or employ such additional officers and such account-
ants, engineers, experts, inspectors, clerks, and employees
as it may deem to be necessary to carry out the provisions
of this act or to perform the duties and exercise the pow-
ers conferred by law upon the commission." The term
"officer" of the commission, as used in the act, does not
refer to the holder of an office as defined in the constitution.
That definition applies only to State officers. (*People* v.
*Brady,* 302 Ill. 576.) It is used in this connection in its
more popular sense, as one holding a position of trust and
authority in any kind of an organization,—civil, military,
political, ecclesiastical or social. The power given to the
commission is to appoint such officers as it may deem neces-
sary. The fact that Slater was transportation rate expert
of the commission neither added to nor detracted from the
force of his appointment. His appointment as an officer
to hold investigations, inquiries and hearings constituted
him an officer of the commission whether he had any other
duties or not. No question is made of the power of the
legislature to authorize the commission to appoint such offi-
cers to assist it in its duties, and there can be no doubt of
the intention of the legislature to authorize such appoint-
ment. The language of section 60 declaring that a hearing
shall be held either by the commission or by one or more
commissioners or assistant commissioners is not necessarily
inconsistent with the power granted by the same section to
officers of the commission designated by it to hold inves-
tigations, inquiries and hearings. It was the manifest in-
tention of the legislature that the commission should have
authority, and it should be its duty, to hold investigations,
inquiries and hearings concerning all matters covered by the
provisions of the Public Utilities act or by any other act
relating to public utilities, and that it should have the bene-
fit of such assistants as it might deem necessary in making
such investigations, inquiries and hearings, and for that
purpose the provision was inserted in the act that it might

appoint officers who should also have the power, under the direction of the commission, to hold such investigations, inquiries and hearings.

The judgment of the circuit court will be reversed and the cause remanded, with directions to set aside the order and remand the cause to the Commerce Commission for further proceedings.

*Reversed and remanded, with directions.*

Thompson and Heard, JJ., dissenting:

One of the most effective means of ascertaining the legislative intent in the adoption of a new statute is to consider it with reference to the state of the law before its adoption, and particularly with reference to previous legislation on the same subject. Prior to the adoption of the present Public Utilities act, in 1921, the commission had authority to hold meetings "at any place within the State." In the new Public Utilities act of 1921 it was provided that all hearings by the commission "shall be held within the county in which the subject matter of the hearing is situated, or if the subject matter of the hearing is situated in more than one county, then at a place or places designated by the commission, or agreed upon by the parties in interest, within one or more such counties, or at the place which in the judgment of the commission shall be most convenient to the parties to be heard." When the legislature adopted the new act and fixed the place of the hearing with reference to situs of the subject matter of the hearing it definitely expressed its judgment that the hearings should not be held "at any place within the State" designated by the commission. It is an elementary rule of statutory interpretation that a statute should be so construed, if possible, as to give meaning to every word, clause and sentence. (*Wells Bros. Co.* v. *Industrial Com.* 285 Ill. 647; *Crozer* v. *People,* 206 id. 464.) The purpose of construing an ambiguous statute is to ascertain and give effect to the intention of the

legislature, and to that end the whole act, the law existing prior to its passage, any changes made in the law by the act, and the apparent motive for making such changes, will be weighed and considered. (*City of Rockford* v. *Schultz,* 296 Ill. 254; *People* v. *Chicago, Burlington and Quincy Railroad Co.* 290 id. 327; *People* v. *Commissioners of Highways,* 270 id. 141; *Soby* v. *People,* 134 id. 66; *Stribling* v. *Prettyman,* 57 id. 371.) Why did the legislature by the act of 1921 fix the place where the commission must conduct its hearings? What was the purpose of the change made by the legislature? Certainly it did not use the specific language for no purpose at all. It is a matter of common knowledge that the Public Utilities act was an issue in the campaign for the elction of a Governor in 1920. One of the charges made against the act was that it denied to the people of the municipalities of the State home rule in the regulation of public utilities. Those holding this view were successful at the polls, and it is reasonable to conclude that the act of 1921 was passed for the purpose of compelling the commission to conduct its hearings in the county in which the subject matter of the hearing is situated, so that the people directly affected by a change in rate or service might conveniently appear before the commission and present their views. Instead of giving effect to the language used by the legislature the court has stricken out of the statute the two clauses which fix the place of the hearing and has imputed to the legislature an intent which it said, as plainly as the English language could say it, it did not have. Where there is in the same statute a particular enactment and also a general one, which in its most comprehensive sense would include what is embraced in the former, the particular enactment must be operative and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment. (*Deneen* v. *Unverzagt,* 225 Ill. 378; *Dodge* v. *City of Chicago,* 201 id. 68; *People* v. *Kipley,*

171 id. 44; *Chicago and Northwestern Railway Co.* v. *City of Chicago,* 148 id. 141.) In such cases the particular provision must be treated as an exception to the general provision. (*Natural Products Co.* v. *County of DuPage,* 314 Ill. 74; *Dahnke* v. *People,* 168 id. 102.) It follows that where an act in one set of provisions gives specific and precise directions to do a particular thing, and in another set authorizes in general terms the doing of that which in the broad sense of the words used in the latter would cover the particular act required by the former, the more general provisions cannot be deemed to include the matters embraced in the more specific ones. (*People* v. *Rose,* 166 Ill. 422.) Under these rules of statutory interpretation, which are founded on logic and the common understanding of language, and which have no exceptions of which we are aware, the provision of the statute under consideration would read: "All hearings before the commission, or any commissioner or assistant commissioner, shall be held at the place which, in the judgment of the commission, shall be most convenient to the parties to be heard, except that the hearing shall be held within the county within which the subject matter of the hearing is situated, or if the subject matter of the hearing is situated in more than one county, then at a place or places designated by the commission or agreed upon by the parties in interest." This gives meaning to every word and clause of the sentence and clearly expresses the intention of the legislature.

The subject matter of the hearing here involved is the rate charged for the transportation of coal between two points situated in Vermilion county. By the principle of *expressio unius est exclusio alterius* the commission is prohibited from conducting the hearing in this case in Cook county or in any county other than Vermilion. The power of the commission to conduct this hearing did not exist until it was granted by the act creating the commission, and, the place for conducting the hearing having been fixed by

the enabling statute, it cannot be lawfully conducted in any other place. The statute creating the commission is the measure of the power given to the commission. (*Public Utilities Com.* v. *Illinois Central Railroad Co.* 274 Ill. 36; *State* v. *Chicago, Milwaukee and St. Paul Railway Co.* 16 S. D. 517, 94 N. W. 406; *Board of Railroad Comrs.* v. *Oregon Railway and Navigation Co.* 17 Ore. 65, 19 Pac. 702.) It is for the legislature to say what authority the commission shall possess and in what manner it shall exercise the granted authority.