Two appeals from the circuit court of Peoria county, No. 19169 and No. 19258, involving bituminous coal freight rates, have been consolidated for hearing. In No. 19258 a *Page 626 
complaint was filed on August 30, 1924, by the W.A. Boley Ice Company and six other receivers of bituminous coal, who were engaged in marketing coal, with their principal offices in Peoria and Pekin, against the Baltimore and Ohio Railroad Company and a large number of railroad carriers engaged in the transportation of bituminous coal in intrastate commerce between Springfield and Lincoln as points of origin and Peoria and Pekin as points of delivery, (docket No. 14395 of the commission,) alleging that the rates charged by the carriers are, and were when exacted, excessive, unjust, unreasonable, unjustly discriminatory and unduly prejudicial to Complainants and in violation of the Illinois Commerce Commission act. The petition prayed for the establishment of just and reasonable rates, free from unjust and unreasonable discrimination, and for an order that the carriers pay to the complainants, by way of reparation, all charges paid in excess of the just and reasonable rates on shipments of bituminous coal for a period of two years before the date of filing the complaint. On November 22, 1924, another complaint was filed, (docket No. 14594,) which was in substance the same as that in No. 14395, except that the Corn Products Refining Company was joined as a complainant and Andrew and Sherman were added as points of origin. Answers were filed by a number of the carriers and intervening petitions by the Illinois Coal Traffic Bureau and a number of shippers and receivers of coal and others, and hearings were held during 1925, 1926 and 1927. By agreement No. 14395 was consolidated for hearing with No. 14594, and on March 29, 1928, the commission made an order finding the rates complained of excessive to the extent that they exceeded one dollar a ton and requiring the carriers to publish and put into effect rates not exceeding that amount, finding also that the complainants were entitled to reparations, and reserving jurisdiction for the purpose of entering orders awarding reparation. A petition for rehearing *Page 627 
filed by the carriers was denied, and an appeal was taken to the circuit court of Peoria county, which entered an order suspending the operation of the order of the Commerce Commission. The circuit court on a hearing affirmed the order of the commission, and the carriers have appealed, the cause being No. 19258 in this court.
In No. 19169 the complaint was filed with the Illinois Commerce Commission by the Illinois Coal Traffic Bureau as docket No. 15196 on June 1, 1925, averring that the complainant was a voluntary organization of coal operators, operating coal mines in the various rate-group districts in Illinois; that such rate-group districts have uniform rates from all points of origin within each of the respective groups, and that generally there have existed differential adjustments as between the various groups in the rates of bituminous coal to destinations involved, the propriety of which has been recognized by shippers, carriers, the public generally and the rate-regulating commissions; that there is a competitive relationship among all of said mines, which calls for a proper rate relationship as between all of said mines and groups; that the mines are highly competitive in so far as the sale of coal to the destinations of Pekin and Peoria is concerned, and that the rate adjustment is a most important factor in the competitive ability of the various mines in those markets; that the rates from all of the groups and mines to the destinations named have been advanced in recent years, and by reason of such changes the rates now in effect are unjust, unreasonable and unduly and unjustly discriminatory and in violation of sections 32 and 38 of the Public Utilities act. The complainant prayed that the commission find the rates in effect on bituminous coal in car-load lots from various mines in the various Illinois groups to be unjust, unreasonable and unduly and unjustly discriminatory and require the carriers to put in effect just, reasonable and non-discriminatory rates. The complaint further averred the pendency before the commission *Page 628 
of the complaints of the W. A. Boley Ice Company et al. vs.
Baltimore and Ohio Railroad Co. et al. (docket Nos. 14395 and 14594), and asked that this complaint be heard in connection with the other two. Answers in the nature of general denials were filed by various carriers and intervening petitions by several receivers and shippers. The complaint in this case was not heard at the same time as the complaints in the other two cases but was heard after the latter. The two earlier complaints attacked the rates from some of the mines in the Springfield group to Peoria and Pekin, and, as the complaint of the Illinois Coal Traffic Bureau questioned all rates from all mines in the Springfield group, it was agreed among all parties, in order to avoid duplication of the testimony, that the entire record in the two earlier cases (Nos. 14395 and 14594) should be considered as a part of the record in this case, No. 15196. On the same day that the order was entered in cases Nos. 14395 and 14594 an order was also entered in case No. 15196, which established the same rate on coal from the Springfield group to Peoria and Pekin as was established by the order in Nos. 14395 and 14594, and also reduced the rates from the Centralia, DuQuoin and Southern Illinois groups to Peoria and Pekin. A petition filed by the carriers for a rehearing was denied, an appeal was taken to the circuit court of Peoria county, and that court entered an order suspending the order of the commission. The circuit court by its final order affirmed the order of the Commerce Commission, and the carriers have appealed.
The assignments of error raise the question, among others, of the sufficiency of the facts found by the Commerce Commission on which to base its order made thereon and of the evidence to support the findings.
Section 65 of the Commerce Commission act requires the commission, at the close of the hearing, to "make and render findings concerning the subject matter and facts inquired into and enter its order based thereon." Such finding must *Page 629 
be specific enough to enable the court to review intelligently the decision of the commission. (Public Utilities Com. v.Springfield Gas Co. 291 Ill. 209; Northern Illinois Light Co.
v. Commerce Com. 302 id. 11.) Reviewing courts will examine the facts on which an order is based, and if the facts found afford a reasonable basis for the order it will be sustained. The findings of fact are, however, subject to re-examination, in connection with the evidence, to determine whether there is substantial evidence — not merely a scintilla of proof — to sustain the order. (Chicago Motor Bus Co. v. Chicago Stage Co.287 Ill. 320; Interstate Commerce Com. v. Union PacificRailroad Co. 222 U.S. 541.) Section 14 of the Interstate Commerce act before the amendments of 1906 required the Interstate Commerce Commission to make a report in writing whenever it should make an investigation, which should include the findings of fact on which the conclusions of the commission were based, and the Supreme Court of the United States held that under the law if the order of the commission was not sustained by the facts upon which it was predicated, the court could not enter into an independent investigation of the facts in order to evolve new and substantive findings of fact upon which the order of the commission might be sustained. (Interstate Commerce Com. v. Chicago, Burlington and QuincyRailroad Co. 186 U.S. 320.) The same principle was announced and followed in the earlier cases of Louisville and NashvilleRailroad Co. v. Behlmer, 175 U.S. 648; Texas and PacificRailway Co. v. Interstate Commerce Com. 162 id. 197, at p. 238; East Tennessee, Virginia and Georgia Railway Co. v.Interstate Commerce Com. 181 id. 1, 27; Interstate CommerceCom. v. Clyde Steamship Co. id. 27, 32.) The section as amended in 1906 relieved the commission of the duty of stating specifically the findings of fact on which it based its conclusions in cases where damages were not awarded and simply required a report stating the conclusions of the commission, together with its order *Page 630 
or decision. (49 U.S.C.A. sec. 14, 1.) The Illinois Commerce Commission act requires findings of facts on which the order is based, and our examination is limited to the facts so found, as was the case in the Federal courts under a similar statute.
The appellees attacked the rates of $1.20 for lump coal and $1.06 for fine coal from Springfield, Lincoln, Andrew and Sherman to Peoria and Pekin. The commission found that the rates of 50 cents for lump and 47 cents for fine coal from Springfield and Lincoln to Peoria and Pekin were in force continuously from 1910 to October 16, 1917, when they were raised 15 cents a ton, and these rates continued until June 25, 1918, when a further increase of 28 cents a ton occurred. There was a reduction of eight cents on October 5, 1918, and the reduced rates continued until October 26, 1920, when they were increased to 126 1/2 and 112 cents. From that time the price varied from 126 1/2 and 112 cents to 133 and 117 1/2 cents, until July 1, 1922. Since this last date the present rate of 120 and 106 cents has been in force. The increase of the present rate over that from 1910 to 1915 is 110 1/2 per cent on lump coal and 125 1/2 per cent on fine coal. The commission found that these rates were to be compared with the increase of 65.375 per cent on freight rates generally during the same time, and that if the latter percentage were so applied the rates of transportation of bituminous coal from Andrew, Lincoln, Sherman and Springfield to Peoria and Pekin would be 94.26 cents on lump coal and 77.73 cents on fine coal.
A comparison of the percentages of increase and decrease of the rates complained of with the percentages of increase and decrease generally is not alone a proper foundation for an order fixing a rate, since the order must be based upon what is reasonable at the time. (Commerce Com. v. Cleveland,Cincinnati, Chicago and St. Louis Railway Co. 320 Ill. 214;Atchison, Topeka and Santa Fe *Page 631 Railway Co. v. Commerce Com. ante, p. 70.) A mere difference in percentage of increase or decrease of rate is not of itself evidence that any rate is too high or too low or is unjustly discriminatory.
The commission found that the distance from Andrew, Lincoln, Sherman and Springfield by single line routes to Peoria was 67.4 miles and to Pekin 61 miles, and that by eliminating the Illinois Traction, Inc., which was dismissed, the distances from the same points to Peoria ranged from 44 to 87 miles, with an average distance of 70 miles, and to Pekin from 35 to 78 miles, with an average distance of 61 miles; that the average distance from Andrew, Lincoln, Sherman and Springfield to Peoria and Pekin was 64.2 miles, producing earnings per ton-mile of 18.7 mills on lump coal and 16.5 mills on fine coal. The average short line distances to Peoria and Pekin are, from Andrew 75 miles, Lincoln 40 miles, Sherman 53 miles and Springfield 60 miles. The average short-line distance to Peoria and Pekin from Andrew, Lincoln, Sherman and Springfield is 57 miles via the Chicago and Alton and Illinois Midland and the Illinois Central railroads. The average short-line distance from fifty-nine points in the Springfield group to Peoria was shown to be 81.9 miles, and the average weighted haul was 76.3 miles to Peoria, covering the movement of coal from the Springfield group in 1925. The average distance by all routes from all mines and shipping points in the Springfield group to Peoria was 86.3 miles on lump coal and 85.4 miles on fine coal. The commission refers to orders made by it prescribing coal rates between certain points and for certain distances, as follows: From Pottstown, Edwards and Olin to Peoria, 55 cents for distances from 8 to 15 miles; from Mapleton, Glasford, Rawalts and Canton to Peoria, 60 cents for distances ranging from 11.4 to 28.4 miles; from Bartlett, Hanna, Farmington (via
Minneapolis and St. Louis railroad) and Middle Grove to Peoria, 60 cents for distances ranging from *Page 632 
3.4 miles to 28.8 miles; from Norris, Brereton, Canton, St. David and Bryant to Peoria, 70 cents for distances ranging from 28.4 to 54 miles; from Ellisville to Peoria, 85 cents for distance of 77 miles; from Ellisville, Farmington, Olin, Norris, Brereton, Canton, St. David, Bryant, Bartlett, Hanna and Middle Grove to Galesburg, 70 cents for distances ranging from 24 to 54 miles; from mines in the Fulton county group to Kewanee, for distances ranging from 55 miles to 87 miles, with an average distance of 69.4 miles, 80 cents, and 80 cents from the same mines to Galva for distances ranging from 53 to 79 miles, with an average distance of 61.4 miles; from Springfield to Decatur, a distance of 38.6 miles via the Wabash railway, 70 cents; from Lewistown, St. David, Canton, Norris, Edwards and Olin to Castleton, 80 cents for distances ranging from 37.7 miles to 62 miles, the average distance being 46 1/2 miles; from Lewistown, St. David, Canton, Norris, Farmington, Edwards and Olin to Wyoming for distances ranging from 31.8 to 57 miles, the average distance being 41.4 miles, 80 cents. Reference is also made to the decisions of the Public Service Commission of Indiana prescribing rates for the transportation of bituminous coal as follows: 55 cents for distances 10 miles and less and 65 cents for distances over 10 miles and less than 30 miles, subsequently reduced to 50 cents and 59 cents, respectively, which are the present rates in Indiana. An order is also mentioned establishing a group rate of 80 cents for hauls from 30 to 50 miles. The commission also referred to the statement of the Interstate Commerce Commission in the IllinoisClassification case, 55 I.C.C. 290, at page 301: "While at various points in the record there are suggestions, chiefly of a minor kind, to the effect that there are differences in the character of the territory comprised in Indiana and Illinois, respectively, from the standpoint of transportation, the consensus of view doubtless is, and we believe this to be correct, that the territory in the two States is *Page 633 
essentially similar in character and that the Indiana-Illinois line does not divide diverse transportation conditions."
The order, after referring to the rates prescribed by the Interstate Commerce Commission in the Slider case, 96 I.C.C. 65, involving rates on ex-river coal from New Albany, Indiana, to destinations in Indiana up to 150 miles, as follows: 10 miles and under, 56.5; 10 miles to 30 miles, 75; 30 miles to 50 miles, 87.5; 50 miles to 70 miles, 100; 70 miles to 90 miles, 112.5; 90 miles to 110 miles, 125; 110 miles to 130 miles, 137.5; 130 miles to 150 miles, 150; — found:
"If this scale were applied for the average distance from the points embraced in the complaint to Peoria and Pekin, Illinois, the rate would be 100 cents. The average distance from all mines in the Springfield group to Peoria is 86.3 miles on lump and 85.4 on fine coal, and applying the same scale to these distances the rate is 112 1/2 cents.
"Cars for the loading of coal moving under the Slider scale are switched by the Southern railway to the loading chute of the Slider Company at New Albany, Indiana. The loaded cars are moved by the said railway from the loading chute. The switching charges of the Southern railway are absorbed by the Pennsylvania railroad or the Monon railroad when such cars are moved to points on the said railroads. Cars moving to points on the Southern railway are switched by the Southern railway from and to their classification yard to and from the loading chute before they are placed in the out-bound trains. The distance from the loading chute to the classification yard of the Southern railway is approximately 1 1/2 miles.
"From the evidence presented in this case it is clear that the operating conditions surrounding the movement of coal from New Albany, Indiana, to points on the Southern railway are more difficult than the operating conditions surrounding the movement of coal from Andrew, Lincoln, Sherman and Springfield, Illinois, to Peoria and Pekin, Illinois. *Page 634 
To points on the Southern railway within 49 miles of New Albany, Indiana, trains pass through five tunnels and seventy-seven cuts, over twelve hills, around forty-one curves, over fourteen trestles, up four grades and over one bridge, but few of these conditions are encountered in the movement of coal from Andrew, Lincoln, Sherman and Springfield, Illinois, to Peoria and Pekin, Illinois.
"In the case of Holmes-Hallowell v. Great Northern Railway, 69 I.C.C. 11, the Interstate Commerce Commission established the following rates for the transportation of coal from Lake Superior docks to the Twin Cities and various points in Minnesota and the Dakotas:
============================================================
Miles Holmes-HallowellRate
------------------------------------------------------------ 30 85 40 94 50 102 60 111 70 119 -----------------------------------------------------------
"The record shows that the average loading, of coal from the Springfield group to Peoria and Pekin, Illinois, is 50 tons per car. In 89 I.C.C. 170, at page 177, Lake Dock Coal cases,supra, the Interstate Commerce Commission stated: 'The average loading of all cars is shown by the record in this case as 35 tons, or approximately the same as stated in our report in theHolmes-Hallowell case.'
"Testimony shows that the transportation conditions from Andrew, Lincoln, Sherman and Springfield, Illinois, to Peoria and Pekin, Illinois, are decidedly more favorable than those surrounding the movement of coal from the Lake Superior docks to points in Minnesota and the Dakotas. The traffic density in the territory in which the *Page 635 
Holmes-Hallowell scale is applied is considerably less than the traffic density in the territory where the assailed rates apply.
"Attention is also directed to the decision of the Interstate Commerce Commission (123 I.C.C. 503) wherein the commission approved a rate of $1.20 per gross ton, or $1.07 per net ton, for the movement of iron ore from South Chicago, Illinois, to Granite City, Illinois. The distance via the Illinois Central railroad for this movement is 280 miles, and the transportation involves the movement through the Chicago switching district, a road-haul movement from Chicago to Granite City, Illinois, and a terminal delivery, with switching absorption, at Granite City, Illinois."
Comparison of existing charges made under similar conditions and of ton-mile earnings constitute proper evidence for consideration in determining what are reasonable rates. The qualification that the charges were made and the ton-mile earnings gained under similar conditions of operation is essential to the probative value and competency of such rate comparisons. Alton and Southern Railroad v. Commerce Com.316 Ill. 625; Commerce Com. v. Cleveland, Cincinnati, Chicago andSt. Louis Railway Co. supra.
In regard to the 80-cent rate from mines in the Fulton county group to Kewanee for distances from 55 to 87 miles, average 69.4 miles, and from the same mines to Galva for distances from 53 to 79 miles, average 61.4 miles, the order cites the commission's docket No. 13213. Counsel for the appellees do not refer in their brief to the place in the abstract where this order of the commission is mentioned and we have not found it. If it was not received in evidence the commission could not consider it. Its order must be based on evidence presented at the hearing. A finding without evidence is beyond the power of the commission to make, and nothing can be treated as evidence which is not introduced as such. (Farmers' Elevator Co. v.Chicago, *Page 636 Rock Island and Pacific Railway Co. 266 Ill. 567; United States
v. Abilene and Southern Railway Co. 265 U.S. 274.) The consideration of this order by the commission was improper.
The order made no findings of fact concerning conditions affording a sufficient basis of comparison of the rates complained of with rates mentioned in the order from the various points of origin to Peoria, Kewanee, Galva, Decatur, Galesburg, Castleton and Wyoming. The facts found are limited to distances and rates, but the reasonableness of a rate cannot be determined from a consideration of these, alone. The same observation is applicable to the findings of fact concerning order No. 5477 of the Public Service Commission of Indiana, establishing rates of 55 cents for distances of 10 miles and less and 65 cents for distances over 10 miles and less than 30; order No. 6646, reducing these rates to 50 and 59 cents, respectively, the present rates in Indiana; and order No. 6881, establishing the group rate of 80 cents for hauls from 30 to 50 miles.
In its reference to the scale of charges fixed in theSlider case, 96 I.C.C. 65, the order finds that if this scale were applied for the average distance from the points embraced in the complaint to Peoria and Pekin the rate would be 100 cents, and if applied to the average distance from all mines in the Springfield district to Peoria, 86.3 miles on lump and 85.4 on fine coal, the rate would be $1.12 1/2. But the order fixes the rate at one dollar. This reduction below the Slider scale appears to be based upon the further finding in the order that "from the evidence presented in this case it is clear that the operating conditions surrounding the movement of coal from New Albany, Indiana, to points on the Southern railway are more difficult than the operating conditions surrounding the movement of coal from Andrew, Lincoln, Sherman and Springfield, Illinois, to Peoria and Pekin, Illinois." The first movement at New Albany to which the Slider scale applies is on the Southern railway, *Page 637 
and the order finds the difficult conditions under which the Southern operates as we have quoted. It also finds that but few of these conditions are encountered in the movement of coal from Andrew, Lincoln, Sherman and Springfield to Peoria and Pekin. Andrew is situated on the railroad of the Chicago and Illinois Midland Railway Company, which operates between Springfield and Peoria over 76 miles of its own track, 10 miles of track between Pekin and Peoria, and two miles at Springfield over which it has trackage rights. On its 76 miles of railroad are forty-eight curves, two of them reverse curves, and several of the others considerable curves on grades which make it hard to handle the trains. The ruling grade is 1.32 per cent at Petersburg, three-quarters of a mile long, over which, with fair weather and the company's motive power, it can take 700 tons, which would ordinarily be eight or nine cars. If a train is 1400 tons, it has to go over the hill in two cuts, and if more, in three. There is one grade of .7 per cent and another of .53 per cent, and there are many other grades, but these are the heaviest. There are forty-seven bridges — two steel, three with steel I-beams, the others wooden. The railroad crosses the Sangamon river three times and the Mackinaw once. Forty-one miles of its road are laid with 90-pound rails, but the remaining 35 miles have only 75-pound rails. About 95 per cent of the business of this railroad is hauling Springfield district coal. It serves no mine outside the Springfield district.
The rates adopted in the Slider case are, in effect, proportional rates, being for coal shipped down the Ohio river to New Albany and there transferred to the railroads and carried to destinations within the State of Indiana. The conditions surrounding proportional and local rates are dissimilar and not comparable. Such proportional rate may properly be lower than a local rate. The Slider scale is also a graded rate for specific distances from a particular shipping point, and is impossible of application to group rates *Page 638 
within a certain territory, regardless of distance. The evidence shows that Lincoln is 40 miles from Peoria, and Gillespie, the most distant point in the Springfield group, is 125 miles. The rate for the one under the Slider scale would be 87.5 cents and the other $1.375. The rate for Andrew and Springfield under the same scale would be $1.125. The uniform rate would be destroyed. The present group system and the Slider system cannot be applied to the same territory at the same time.
The rate scale established by the Interstate Commerce Commission in Holmes-Hallowell v. Great Northern Railway, 69 I.C.C. 11, for the transportation from Lake Superior docks to the Twin Cities and various points in Minnesota and the Dakotas, with its rates from 30 to 70 miles ranging from 85 to 119 cents, affords no substantial foundation for reducing to one dollar the rates from the points of origin involved in this case, whose short line distances from Peoria and Pekin are 40, 53, 60 and 75 miles. The commission finds as a fact that the average loading of coal from the Springfield group to Peoria and Pekin is 50 tons a car, and that in Lake Dock Coal cases, 89 I.C.C. 170, the Interstate Commerce Commission stated: "The average loading of all cars is shown by the record in this case as 35 tons, or approximately the same as stated in our report in the Holmes-Hallowell case." This is no finding that the average loading of cars involved in the Holmes-Hallowell case
was only 35 tons. Both the Lake Dock Coal cases, in which the statement quoted is made, and the Holmes-Hallowell case, were cases between different parties from those in this case, in a different tribunal and upon different issues. The statement in one case that the tribunal in another had stated a particular fact is no evidence in another controversy upon a different issue between different parties and in another tribunal of the correctness of the fact stated. The commissioners cannot act on their own information. Their findings must be based on evidence *Page 639 
presented in the case, with an opportunity to all parties to know of the evidence to be submitted or considered, to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal, and nothing can be treated as evidence which is not introduced as such. Farmers' ElevatorCo. v. Chicago, Rock Island and Pacific Railway Co. supra;United States v. Abilene and Southern Railway Co. supra;Interstate Commerce Com. v. Louisville and Nashville RailroadCo. 227 U.S. 88; United States v. Baltimore and OhioSouthwestern Railroad Co. 226 id. 14.
The commission found that "the transportation conditions from Andrew, Lincoln, Sherman and Springfield, Illinois, to Peoria and Pekin, Illinois, are decidedly more favorable than those surrounding the movement of coal from the Lake Superior docks to points in Minnesota and the Dakotas. The traffic density in the territory in which the Holmes-Hallowell scale is applied is considerably less than the traffic density in the territory where the assailed rates apply." There was no substantial basis in the evidence for this finding. It rests upon the testimony of C.B. Ackerman, who undertook to give the ruling grades of the Great Northern railway from Duluth west, and on objection that he had not shown that he had any knowledge, stated that the source of his information was the official blue-print map furnished to him by the Great Northern in 1923 from its mechanical or operating department by an officer whose office he did not state and whose name he did not know. Objection was made to his testifying from the blue-print but was overruled, and he testified from the blueprint to many grades and curves. He also testified in regard to the Northern Pacific, regarding which he testified that the source of his information was the same as the Great Northern. He testified that he had profile maps of every transcontinental railroad in the United States and Canada, obtained in the same way, and, if necessary, he *Page 640 
would be equally ready to testify to the others. His testimony was of no value and was not competent. He was only the means of putting the profiles which he produced before the commission. What he said, though it purported to be testimony, was in no way pertinent to the case. It added nothing to the profiles, which were not offered in evidence and could not have been admitted over objection, even if otherwise competent, because they were not authenticated in any way. The statements of the witness that he had traveled over these roads as a passenger many times, that he had made sixteen trips to the Pacific coast and back, and when he was not busy making a long trip he was busy throughout the East or the Western Trunk Line territory, that he believed that he had testified more than any man had ever before testified in the same length of time before the Interstate Commerce Commission, had no tendency to prove anything in regard to the operating conditions of the Great Northern or Northern Pacific railroad in comparison with any other railroads.
The reference in the order to the Indiana rates, and the fact that they had been reviewed by the Interstate Commerce Commission, which declined to interfere with them, and to the expression of opinion by the Interstate Commerce Commission in the Illinois Classification case, 55 I.C.C. 290, "that the territory of the two States [Illinois and Indiana] is essentially similar in character and that the Indiana-Illinois line does not divide diverse transportation conditions," furnished no basis or support for the order made. It is not proper for the commission to consider facts found by another tribunal in a different case between different parties and on different issues.
The commission found that "the ton-mile earnings from the Springfield, Illinois, group to Chicago, Illinois, for the average distance of 223 miles is 7.39 mills, and from the Southern Illinois group to Chicago, Illinois, for the average distance of 348 miles, 5.6 mills. With the exception of the *Page 641 
rates from the Northern Illinois group of mines and the Danville group of mines to Chicago the earnings per ton per mile from all mines in Indiana and Illinois to Chicago are 8.38 mills, and less. These rates offered by the defendants for comparative purposes produce ton-mile earnings so much in excess of these earnings that the conclusion must be reached that they are improper rates for use in determining the relative reasonableness of the rates assailed. In reaching this conclusion we are not unmindful of the fact that as distances increase the earnings per ton per mile might properly decrease. * * * The earnings per ton-mile on coal from the various groups of mines in Illinois to Chicago, Illinois, range from 5.35 mills to 11.6 mills. These rates are differentially related group rates which have been in effect for a long period of time. For the average distance of 86.3 miles from all mines in the Springfield group to Peoria, Illinois, based upon the earnings per ton perk mile of 5.35 mills, the rate would be 47 cents, and based on the earnings per ton per mile of 11.6 mills, 100 cents."
A comparison of the Chicago rates with the rates to Peoria furnished no basis for the reduction of the latter rates which the commission ordered. A similarity of conditions must be shown before any comparison can have value in the determination of rates. The average distance over which the Chicago rates apply is from 245 to 253.8 miles, while the average distance to Peoria and Pekin from the points of origin involved in this case is found by the commission to be 64.2 miles. It is apparent that the conditions of transportation on these short hauls are different from those which prevail on the longer hauls to Chicago, and upon a comparison of such rates the per-ton-mile revenue test can be of little value. The volume of the movement is also much greater to Chicago than to Peoria and the competition more severe. The evidence shows that Chicago is a great coal consuming center, for whose market the mines of western Kentucky, Illinois and *Page 642 
Indiana are in competition with the mines of the east — the Crescent districts; that approximately 31,500,000 tons of coal are shipped into Chicago each year, of which 1,500,000 tons come by boat and the balance is about equally divided between the mines of western Kentucky, Indiana and Illinois on the one hand and the eastern mines on the other, each of those two large groups supplying about 50 per cent of the demand under the competitive rates which exist. On the other hand, Peoria consumes about 700,000 tons a year, of which in 1925, under the existing competitive rates, the Springfield group of mines supplied 303,344 tons, the Groveland Coal Mining Company in the Fulton-Peoria district and the Crescent Coal Company in the Le-Marsh district, in the Peoria-Pekin switching district, supplied 112,000 tons. The Groveland Coal Mining Company, a Fulton county mine, the Crescent Coal Company, and the mines of which they are representative, cannot compete in the Peoria-Pekin market with the Springfield group if the rates from the latter group are to be lowered. This results from more difficult operating conditions at the mines and the inferior quality of the coal.
Moreover, the Chicago rates must be adjusted with the competitive rates of the eastern railroads carrying coal to Chicago from the eastern fields in competition with coal produced in Illinois, Indiana and Western Kentucky fields. Operating conditions between some of the Illinois groups and Chicago are different from conditions between Springfield and Peoria. For instance, from Mattoon to Peoria the 1501-class engine can haul 3800 tons; from Springfield to Clinton 3840 tons. The same class engine on the Illinois Central division north from Centralia to Chicago will haul 6000 tons. Between Springfield and Peoria the maximum grade is at Bissell, between Springfield and Mt. Pulaski. It is a 42-foot grade — a little less than one per cent. Then there is a one-half per cent grade at Mt. Pulaski, which makes it hard to stop a train and then *Page 643 
start it. The traffic over the Chicago and Alton from Springfield to Bloomington is five times as great as that between Springfield and Peoria. The charges absorbed at Chicago on traffic going to other lines for delivery range from $13.50 to $22.95 a car. The charges which the carrier from the Springfield district must pay at Peoria range from $12.35 to $17.21 a car. There is a difference between the situation at the two terminals, however, in that the three lines which carry most of the coal from Springfield and adjacent points to Peoria, — the Chicago and Alton, the Illinois Central and the Chicago and Illinois Midland, — have no terminals at Peoria and must pay the absorption on every car of coal destined to that point, while at Chicago the line-haul carriers do not have to pay absorptions unless the coal is destined to an industry or a team-track on the line of some other carrier. Another element affecting conditions in relation to the Chicago rate is the transportation of iron ore in open-top coal cars over the Illinois Central from South Chicago to Granite City, a distance of 280 miles, at a rate approved by the commission of $1.20 a gross ton or $1.07 a net ton. The conditions surrounding this movement are entirely different from those attending the movement of coal from the Springfield group to Peoria. The cars in which coal is hauled from the Springfield group to Peoria are invariably hauled back empty, because there is no return loading of a commodity that would be hauled in a coal car. The case would be the same with the Illinois Central coal cars from Southern Illinois on their return but for the loading with iron ore, which enables the cars to earn a revenue for 280 Miles of the return trip.
The commission made no other findings concerning the subject matter and facts inquired into, upon which its order was based, than those which we have mentioned and held to be insufficient to sustain the order. The circuit court erred in not setting aside the order in No. 19258. Other *Page 644 
objections made to the order need not be considered, because they may be obviated by the commission in its further consideration of the case.
In No. 19169 the order of the commission reduced the rates to Peoria and Pekin of the four groups attacked by the complainant as follows: The Springfield group from $1.20 and $1.06 to $1; the Centralia group from $1.59 to $1.40; the DuQuoin group from $1.79 to $1.60; and the Southern Illinois group from $1.92 to $1.70. The findings of fact made by the commission on which its order was based are insufficient to justify the order and without substantial basis in the evidence. The commission, after setting out the various rates to Peoria and Pekin from the districts involved from 1910 to the filing of the complaint, compared the rates previously fixed by the commission for hauls to Peoria and Pekin from near-by mines, ranging in distance from 5.4 miles to the average distance of the Fulton county group of 72.8 miles and in rates from 55 to 85 cents, with the average weighted haul of 76.3 miles from the Springfield group, found a substantial similarity in transportation conditions surrounding the movement of bituminous coal to Peoria and Pekin from the Fulton county and Springfield group mines, compared the rates assailed with the rates upon coal from the same groups to Chicago, found that the Chicago rate was not fixed upon consideration of competitive conditions but had its origin in the entry of an order by the Railroad and Warehouse Commission of Illinois prescribing just and reasonable rates, following an exhaustive investigation to determine the rates to which the railroads were entitled in order to provide sufficient revenue to pay all operating costs, depreciation, taxes and a fair return on investment; that terminal charges to be absorbed were greater in Chicago than in Peoria and Pekin; that the greater part of the Chicago hauling was over the same railroads as to Peoria and Pekin, though Peoria and Pekin were not on the direct routes to Chicago; that the *Page 645 
distance from the Southern Illinois group to Peoria was approximately the same as the distance from the Centralia group to Chicago, and the differentials as between the different groups should be on the same basis as the differentials on hauls to Chicago; and that transportation conditions surrounding the movement of bituminous coal from the Southern Illinois, Centralia and DuQuoin groups to Chicago are substantially similar.
The finding that the rates from the various districts to Chicago had their origin in a proceeding before the Railroad and Warehouse Commission of Illinois prescribing just and reasonable rates, following an exhaustive investigation to determine the rates to which the railroads were entitled in order to provide sufficient revenue to pay all operating costs, depreciation, taxes and a fair return on investment, had no support in the evidence. The order of the Railroad and Warehouse Commission was not offered in evidence and no reference is shown in the abstract to have been made to it. No copy of it was produced and no evidence offered of its contents or of the proceedings of the Railroad and Warehouse Commission. (Atchison, Topeka and Santa Fe Railway Co. v. Commerce Com.ante, p. 70.) It was shown that the rates in question were within the reasonable maximum distance scale fixed by the commission, and the burden was therefore on the complainant to show that they were unreasonable. (Commerce Com. v. Cleveland,Cincinnati, Chicago and St. Louis Railway Co. supra; PublicUtilities Com. v. Atchison, Topeka and Santa Fe Railway Co.278 Ill. 58.) Eliminating the finding of the commission which was not based on any evidence, all that remains is a comparison of rates and distances, with a finding that operating conditions are comparable. The evidence clearly showed that the Chicago traffic was carried over lines of far heavier traffic density than the Peoria traffic after the latter left the main lines; that the lines by which the Peoria traffic was finally to be *Page 646 
served, because of grades, did not admit of nearly so efficient and cheap transportation as did the lines over which the Chicago traffic was served; and it also appeared in evidence that where heavy traffic is carried, the hauling of freight is, up to the point of capacity, cheaper than over lines of less traffic density. For these reasons, and others which have already been stated in this opinion, the Chicago rates were not comparable with the rates to Peoria and Pekin.
The judgments are reversed and the causes are remanded to the circuit court, with directions to set aside the order of the Commerce Commission and to remand the causes for further consideration by the commission in accordance with the views expressed in this opinion.
Reversed and remanded, with directions.